F. E. ATTEAUX AND COMPANY, INC. *vs.* MECHLING BROTHERS
MANUFACTURING COMPANY.
MECHLING BROTHERS MANUFACTURING COMPANY *vs.* F. E.
ATTEAUX AND COMPANY, INC.

Suffolk.   March 12, 1923. — June 1, 1923.

Present: RUGG, C.J., BRALEY, DeCOURCY, CROSBY, & PIERCE, JJ.

*Contract,* In writing, Modification, Performance and breach. *Frauds,*
*Statute of.* Damages, In action of contract.

Two suits in equity based upon a contract in writing between a corporation
manufacturing hyposulphite of soda and sulphide of soda and a corporation
appointed by it as its selling agent were heard by a master who found that
modifications of the contract, doubling the quantities which the manufacturer
was to produce and the agent was to sell, were made by the parties and were
evidenced by certain letters passing between them, in reliance upon which
the manufacturer had increased its plant. On appeal from a final decree
for the manufacturer, it was *held,* that the findings by the master showed
such a modification, and that the agreement of modification was sufficiently
evidenced by letters to meet the requirements of the statute of frauds.

From the construction of the contract above described, it was *held,* that,
although it appeared that a high cost of producing the manufactured
articles which resulted from the operations of the manufacturer, judged
by an external test or standard, (i.e. by the ordinary care, prudence and
economy customarily used by other manufacturers,) was due to the lack
of such ordinary care, prudence and economy, nevertheless, since it appeared
that the manufacturer, in manufacturing this product, exercised good
faith, was actuated by an honest purpose to produce it as economically
and at as low a cost as was consistent with the manufacture of a merchant-
able article of good quality, and was wholly uninfluenced by any considera-
tion that the greater the cost the greater would be its profit, it was not
open to the agent to show that, during the period when both parties were
acting under the contract and before its breach, the cost would have been
less if the manufacturer had exercised that ordinary care, prudence and
economy usual among other manufacturers.

Certain provisions of the contract which formed the basis of the suits above
described were as follows: "The party of the second part [the agent] does
hereby agree to sell for the party of the first part [the manufacturer] their
whole output of the above described articles at prices which will net at
least an average of 10% profit to the party of the first part for said term,
upon the amount of all sales.   Should the profits at the end of any one year
average less than 10% , for the preceding portion of the term of this con-
tract, the party of the second part agrees to pay the party of the first part
a sum which will make the average equal 10%; such amount paid is to be

reimbursed to the party of the second part from any profit above 10% in the succeeding years under this contract." After the contract had been in operation for over a year, the agent refused further to abide by the ten per cent clause. *Held,* that such conduct amounted to a repudiation of the contract and was a breach going to its essence, which relieved the manufacturer from further performing and subjected the agent to damages resulting from such breach.

Although, previous to the repudiation of the contract by the agent as above described, the manufacturer voluntarily and intentionally had refrained from producing much in excess of the anticipated requirements to meet the orders of the agent and did not assert its right to produce to its full capacity or to require the agent to sell to that capacity, its waiver of the requirements went no further, and its right after the repudiation to require the agent to dispose of its product at the total contract capacity or to pay damages for not doing so was unaffected and in full force, as also was its right to damages resulting from the failure of the agent to pay the guaranteed ten per cent on such products as actually had been manufactured and shipped before the repudiation.

Under the contract above described, it was *held,* that the loss of prospective guaranteed profits was plainly within the contemplation of the parties as the probable result of a breach, was the natural and probable consequence of the breach, and was susceptible of reasonably certain and satisfactory proof.

Prospective profits which were lost by the breach of the contract above described on the part of the agent were *held* not to have been uncertain or conjectural; *and, also,* it was *held* that a calculation by the judge on findings of the master of damages due to the loss of such profits was warranted and was correct.

The manufacturer, having notified the agent, after the agent's repudiation of the contract above described, that by reason thereof it did not consider itself further bound by the contract, was not entitled to recover for losses incurred in the operation of the plant after such repudiation.

BILL IN EQUITY, filed in the Superior Court on June 8, 1909, and afterwards amended to have the contract, described in the opinion, declared null and void, for an accounting " of the damage due to the plaintiff by " reason of certain " unlawful acts of the defendant . . . and that the plaintiff have judgment and execution therefor," and that an action at law by the defendant against the plaintiff be enjoined. Also a

CROSS BILL IN EQUITY, filed on December 16, 1914, by the defendant in the original suit against the plaintiff therein seeking an accounting as to amounts due to the plaintiff in the cross bill from the defendant therein under the contract described in the opinion.

The original suit was referred to a master on April 5, 1910, and on January 26, 1915, the cross bill was referred to the same master, by whom the two suits were heard together.

As to the agreement between the parties to increase the quantities mentioned in the contract from ten tons to twenty tons of hyposulphite of soda per day, and from five tons to ten tons of sulphide of soda per day, it appeared that there was correspondence between the parties; that, with relation to the hyposulphite, the Atteaux Company on January 1, 1908, wrote to the Mechling Company, " If you can give us twenty tons a day, we will guarantee to take care of it;" to which the Mechling Company replied on January 4, " We are starting to increase the capacity of our plant to take care of all your business; " and that alterations in the plant were made accordingly.   Relating to the modification of the contract by increase in the sulphide requirements, the master found that on " December 21, 1907, the Atteaux Company wrote in part: ' We have contracts closed and ready to close that will take care of at least ten tons a day, and are anxious to have you increase the capacity of your plant, both on hypo and sulphide, at the earliest possible moment. . . .'   With respect to the sulphide plant, the only express reference to an increase made by the Atteaux Company was in the letter of December 21, 1907, above referred to, in which the Atteaux Company expressed anxiety to have the Mechling Company increase the capacity of the plant, both on hypo and sulphide, at the earliest possible moment.   The Mechling Company altered its plans and proceeded with the installation of a plant larger than originally contemplated, but did not expressly communicate this fact to the Atteaux Company until March of 1908, in reply to a letter of March 26, in which the Atteaux Company wrote as follows: ' We think perhaps it would be wise to go a little slow on the sulphide business until we arrive at some understanding with our competitors '; and suggested the possible necessity of making some arrangement with the General Chemical Company to buy some sulphide from them in order to control the situation.   The Mechling Company replied on March 28 in part as follows: ' The

balance of the material necessary to increase to a ten-ton plant is either already in place or in transit, and the whole plant for producing ten tons' should be in operation by the end of next month. Under these circumstances we think it would not be wise to purchase more than is necessary to keep you going until we are ready to supply the increased quantity, but if you can sell more than the ten tons per day which we are to produce, we cannot see any objection to purchase of any such amount.' At the time of the correspondence last above referred to, the first sulphide furnace was in the stage of experimental operation. This was intended to have a five ton capacity. With the intention of increasing the plant to a ten ton capacity certain changes had been made in the sulphide building and its equipment. Additional equipment had been ordered and materials had also been ordered for another furnace of a type and capacity similar to the first. I do not construe the correspondence noted above as withdrawing the Atteaux Company's earlier request for an increase of the sulphide plant. The coal burning furnace subsequently begun was designed to have a ten ton capacity, and upon the facts reported above I find that the Atteaux Company requested an increase in the plant, that the Mechling Company proceeded with the intent to erect a ten-ton plant, notified the Atteaux Company that it was doing so, that the Atteaux Company acquiesced therein, and that thereby the production of an increased quantity of sulphide, i. e., ten tons a day, was mutually agreed upon by the parties."

Other material findings by the master are described in the opinion. Exceptions to the master's report were filed by both parties. Such matters of law as were raised by such exceptions are in substance described in the opinion. F. E. Atteaux and Company, Inc. moved for a decree in its favor in the original suit in the sum of $4,668.74 and for a decree dismissing the cross suit. The suits were heard upon the exceptions and the motion for decrees by *McLaughlin*, J., by whose order there were entered an interlocutory decree overruling the exceptions of both parties and confirming the report, and a final decree dismissing the bill in the

original suit and, in the cross suit, adjudging that there was due from F. E. Atteaux and Company, Inc. to Mechling Brothers Manufacturing Company the sum of $18,687.34 as damages, with interest amounting to $14,933.99, and directing the payment of that sum and costs by F. E. Atteaux and Company, Inc.

F. E. Atteaux and Company, Inc., appealed from the interlocutory decree and both parties appealed from the final decree.

*W. G. Thompson & A. Lincoln,* for F. E. Atteaux and Company, Inc.

*E. R. Anderson & R. B. Owen,* for Mechling Brothers Manufacturing Company.

PIERCE, J.   This is a suit in equity brought by F. E. Atteaux and Company, Inc. (hereinafter called the Atteaux Company) against Mechling Brothers Manufacturing Company (hereinafter called Mechling Company) to enjoin the prosecution of an action at law, brought by the Mechling Company against the plaintiff in the Superior Court upon a written contract, and to have that contract annulled and set aside as having been procured by fraud.   The action at law was never entered in the Superior Court.   The defendant Mechling Company by a cross bill seeks damages for the alleged breach of the aforesaid contract by the plaintiff Atteaux Company.

The case was referred to a master and was subsequently heard by a judge of the Superior Court upon exceptions by both parties to the master's report and the plaintiff's motion for a decree.   The presiding judge filed a statement of his decision and entered an interlocutory decree overruling the exceptions to and confirming the master's report.   He also entered a final decree dismissing the bill of complaint and awarding damages to the Mechling Brothers Manufacturing Company in the sum of $18,687.34, with interest thereon from May 17, 1909, to the date of the decree.

It appears in the master's report that the Mechling Company entered into a written contract on November 13, 1907, with the Atteaux Company, by which the Mechling Company appointed the Atteaux Company its exclusive

selling agent for the sale of hyposulphite of soda and sulphide of soda, agreeing to produce certain stipulated quantities; and the Atteaux Company agreed to sell the entire output at a certain minimum net profit to the Mechling Company. The Atteaux Company contended before the master, as charged in its bill, that the contract between the parties had been procured by fraud. On this issue the master found in favor of the Mechling Company, and the Atteaux Company does not now contend that it is entitled to have the contract set aside for fraud in its inception.

The immediate circumstances attending the execution of the contract succinctly stated, as reported by the master, are that the Atteaux Company had for a number of years been engaged in the sale of hyposulphite and sulphide of soda as the general selling agents for the Grasselli Chemical Company; and when this agency was about to expire, in January 1, 1908, it looked around for a new source of supply for these chemicals. Atteaux, president of the Atteaux Company, was generally familiar with the various plants which had manufactured hyposulphite and knew that the Mechling Company had purchased the equipment of an old plant which from 1891 until 1895 had been operated in Walpole, Massachusetts, under the superintendence of a man named Smith. Atteaux's relations with Smith were close, and he had been instrumental in securing the employment of Smith as superintendent at the Grasselli Chemical Company. Smith, however, was no longer in that employment, and it occurred to Atteaux that the time was opportune so to arrange matters with the Mechling Company that he could now procure hyposulphite from Smith's old plant with Smith in charge. Somewhat extended negotiations followed, in the course of which the Atteaux Company represented to the Mechling Company that it knew a competent superintendent for the manufacture of the products in question, that it could furnish this man, and that it would not particularly care to take up the matter unless it placed this man (Smith) with the Mechling Company. During the course of these negotiations Smith was constantly relied upon by Atteaux in obtaining information with regard to

the situation at the works of the Mechling Company, and was finally employed by the latter at the time it entered into the contract.

The contract is set out in full in the master's report. The provision by which the Atteaux Company was appointed sole and exclusive selling agent is as follows: " That the party of the first part [Mechling Company] does hereby appoint the party of the second part [Atteaux Company], its sole and exclusive Selling Agents, for the sale of all Hyposulphite of Soda and Sulphide of Soda manufactured by the party of the first part, for a period of five (5) years from January 1st, 1908." The correlative provision with respect to the obligation of the Atteaux Company reads as follows: " The party of the second part [Atteaux Company] does hereby agree to sell for the party of the first part [Mechling Company] their whole output of the above described articles at prices which will net at least an average of 10% profit to the party of the first part for said term, upon the amount of all sales. Should the profits at the end of any one year average less than 10%, for the preceding portion of the term of this contract, the party of the second part agrees to pay the party of the first part a sum which will make the average equal 10%; such amount paid is to be reimbursed to the party of the second part from any profit above 10% in the succeeding years under this contract. . . . The party of the first part hereby agrees to allow the party of the second part a commission of 5% on the amount of all sales after charges for freight and drayage have been deducted. The commission herein provided for is to cover all services and expenses connected with the sale of these articles. The said commission is to be considered as part of the manufacturing cost and to be on the net price realized by the party of the second part at their works. . . . In case, however, at any time the party of the first part shall notify the party of the second part that the profits on the sales for the previous part of the contract shall not have netted them an average 10% profit in their sales, up to such time and shall furnish them with a detailed statement in writing of the cost of production and sale, the party of the

second part shall cease to deduct their commission for selling from the bills or statements of shipments and shall remit the whole amount of the bills or statements less 1% discount for cash until the profits shall be ascertained to have amounted to an average of 10% as hereinbefore provided. The profits of the party of the first part on sales shall be deemed to be the difference between the amount (not deducting said 1% cash discount) of the sales, after charges for freight and drayage have been deducted, and the cost of production and sale, and such cost shall be ascertained as follows, to wit: to the cost of material, labor, superintendence, steam, fuel, water, repairs of plant, shall be added, the aforesaid commission of 5% for selling, and to the aggregate of all the foregoing, 5% thereof to cover the items of rent, interest, taxes and office expenses. The said party of the first part shall keep separate accounts of said expenses and in the case of steam, water, or other things furnished through the general plant of the party of the first part, the cost shall be estimated from all sources available therefor. The books and plant of the party of the first part relating to the said business shall be open at all convenient times to the inspection of a duly appointed representative of the party of the second part."

The obligation of the Mechling Company with respect to its production of the articles to be sold by the Atteaux Company is as follows: " The party of the first part hereby agrees to produce an average of ten tons of Hyposulphite of Soda and five tons of Sulphide of Soda per day, and such increased quantity as may be mutually agreed upon by the parties to this contract." The master justifiably finds upon the facts and evidence reported that the provision of the paragraph last quoted was modified by substituting the word " twenty " for the word " ten " and the word " ten " for the word " five," so as to provide that the Mechling Company would produce an average of twenty tons of hyposulphite of soda and ten tons of sulphide of soda per day instead of ten tons of hyposulphite and five tons of sulphide as provided in the contract.

The contract contained the provision that " This contract

shall go into effect on January 1st, 1908, or as soon thereafter as the party of the first part can get its plant in operation." After the execution of the contract the Mechling Company proceeded to build a plant for the manufacture of sulphide (it having possessed no such plant at the time that the negotiations were entered into), and also to get their existing hyposulphite plant into operation. The master reports that in both cases the work took longer than was anticipated, and that the beginning of operations was further delayed by reason of requests made by the Atteaux Company in December for the increase in capacity, above referred to, both of the hypo plant and the sulphide plant and by preparations made by the Mechling Company to carry out these requests; that the first successful manufacture of hypo was on January 14, 1908, the first shipment was on January 17, 1908, and by February 8, 1908, the Mechling Company was filling orders with substantial regularity; that by March 1, the preliminary stage of operations may be said to have been passed, — the hypo plant, as originally planned, was capable of regular operation to capacity, and that by May 1 the hypo plant with the addition made at Atteaux's request was capable of regular operation to its increased capacity. The sulphide plant, the master says, was subject to more serious delays, a five ton furnace was started in the latter part of February which failed to work satisfactorily and was discarded; operations with a second and larger furnace were begun about August 20, and by September 1, but no earlier, there was a sulphide plant capable of regular operation to capacity. By October 1, the further alterations and additions tending to increase the capacity of the plant were completed.

The Atteaux Company contended before the master that the delay in getting the plant or plants into operation as to hyposulphite as well as sulphide constituted a breach of the contract on the part of the Mechling Company. The master found with respect to the hypo plant that the officers and agents acted in good faith and honestly endeavored to the best of their ability to get the plant in operation as soon as possible; and that the Mechling Company, judged by an

external standard of diligence, acted with reasonable diligence under all the circumstances of the case. As regards the sulphide plant the master finds the officers and agents acted with reasonable diligence and prudence under all the circumstances, including the employment of and reliance upon Smith, but if they are to be held to the highest standards of skill to be expected of fully qualified experts in the construction of sulphide plants, that performance fell short of such a standard. We think the finding was warranted in the light of all the circumstances and we are of opinion that the Atteaux Company by its conduct waived any right to terminate the contract because of the failure of the Mechling Company to get the sulphide plant in full operation, with the reasonable diligence and prudence of experts fully qualified in the construction of sulphide plants.

The parties continued to operate under the contract until April, 1909. The master reports that, from the time when the plant was in full operation until April, 1909, the routine of the contract was carried on with substantial regularity, production being maintained beyond the requirements for orders and shipments. He finds the principal incidents during this period were the trade war and price cutting, in which the Atteaux Company became involved as early as March, 1908; and a brief period of slight financial embarrassment on the part of the Atteaux Company in the summer of 1908. The trade war became serious, and so continued throughout the period in question. All the Atteaux Company's contracts with customers were subject to reduction in price in case of change in market price. The Atteaux Company failed completely in its attempts to control market prices and was obliged to reduce prices generally. As early as March, 1908, the Mechling Company advised the Atteaux Company that at prevailing prices they were running very close to cost; and on May 8, wrote that no profit was likely. On July 28, 1908, the Mechling Company gave notice under the agreement to remit collections in full without deducting five per cent commission. After April 1, 1908, the Atteaux Company was unable to obtain orders of hypo to the capacity of the plant, and the Mechling Company intentionally

refrained from producing much in excess of the anticipated requirements. Subsequent to that date the Mechling Company never produced to the capacity of the hypo plant for any considerable period, and when the increased plant was completed the average production was far below capacity.

The master reports that the relations between the parties became strained the latter part of the year 1908. The strain was due on the one hand to the failure of the Atteaux Company to control the market and to furnish sufficient orders for the whole possible output of the hypo and sulphide plants, and on the other hand to the high cost of sulphide and the burden thus thrown upon the Atteaux Company. The Mechling Company constantly pressed for more orders, but showed consideration in not forcing their output. The Atteaux Company acquiesced for a short time in remitting collections without deducting commissions; and treated the early reports as to costs, and in particular as to sulphide costs, as matters for further investigation. The Mechling Company freely admitted that the sulphide costs were high and purposely deferred taking a definite position with regard to them.

Beginning in November, 1908, various suggestions were made for the possible modification of the contract. At a conference held on April 12, 1909, Atteaux stated, without qualification, that he would not go on with the contract unless the ten per cent clause was taken out of it; but offered to go on buying hypo at a fixed price. Mechling declined the proposition, stating that he would not go on without the ten per cent clause. With reference to the claim of the Mechling Company for reimbursement for its operating loss and guaranteed profit to date, and its protest against Atteaux's course in deducting his commissions, Atteaux replied that since the costs were out of proportion to what the costs of other manufacturers would have been for making the same article, he did not consider that the Atteaux Company was bound by the contract. The question of arbitration was also referred to, and Mr. Atteaux stated that under the circumstances he did not care to have the actual cost

arbitrated. The Atteaux Company, not having qualified its previous refusal on April 12 to recognize any liability under the ten per cent clause to date, the Mechling Company on April 20, 1909, notified the Atteaux Company that it did not consider itself bound to carry out the contract further and definitely refused to make any more shipments. After this no material negotiations occurred between the parties. The Mechling Company discontinued filling orders. The Atteaux Company continued to account for the proceeds of goods shipped, deducting commissions, and the Mechling Company received the payments on account, protesting against the deduction of commissions. No question was raised before the master but that, except for the ten per cent clause and commissions, the account between the parties for actual sales to date has been properly adjusted.

The master found that the Atteaux Company upon the facts reported repudiated any obligation under the ten per cent clause; that in so far as it is a question of fact, the conduct of the Atteaux Company in repudiating the ten per cent clause, if without justification, was a breach going to the essence of the contract; on the other hand, if the Mechling Company was not justified in thereupon refusing for this shipment, he found, in so far as it is a question of fact, that its conduct in this particular was a breach going to the essence of the contract.

He further found that neither party waived any of its legal rights against the other according to the terms of the contract, except in the following one particular: that if the Mechling Company was at all in default in connection with the delay in attaining full commercial productions, in so far as it is a question of fact, the Atteaux Company by its subsequent conduct waived any right to terminate the contract or to refuse further performance on this ground; although it did not waive its rights, if any, to damages.

The master found damages in favor of the Mechling Company, if the Mechling Company is entitled to recover its ten per cent profit on actual production to April 1, 1909, when performance under the contract ceased, in the sum of $14,868.74. He reports other figures upon various hypoth-

eses as to what the court may decide to be the appropriate rule of damages, if the Mechling Company is entitled to recover damages for the breach of the contract, both for the period to April 1, 1909, and for the balance of the contract period, and including loss of prospective profits. He reports, if material, that the amount expended for building the sulphide plant and enlarging the hypo plant was upward of $20,859.54.

He finds that, if the Atteaux Company is entitled to damages for loss of customers and injury to good will caused by the Mechling Company's conduct in and after the breach between the parties, the amount of such damage was substantial and capable of estimation, and he finds these damages to be $15,000.

The Atteaux Company filed twenty-nine exceptions upon the grounds set forth in its like number of objections taken before the master. It also presented twenty-two requests for rulings and findings to the judge of the Superior Court; most of which were given. The Mechling Company filed four exceptions based upon objections to the findings and rulings of the master. The Atteaux Company took an appeal from the interlocutory decree overruling its exceptions and confirming the master's report, and both plaintiff and defendant appealed from the final decree.

The judge of the Superior Court summarized the questions presented by the exceptions of the Atteaux Company and the Mechling Company which cover the issues raised and argued in the briefs of counsel with substantial inclusiveness and accuracy. These questions are stated as follows:

" 1. Was the written contract, which was executed November 17, 1907, subsequently modified by agreement of the parties by substituting in the sixth clause thereof the word ' twenty ' for the word ' ten,' and the word ' ten ' for the word ' five,' so as to provide that the Mechling Company would produce an average of twenty tons of hyposulphite of soda and ten tons of sulphide per day, instead of ten tons of hyposulphite and five tons of sulphide as originally contemplated.

" 2. If the parties did undertake to thus modify the

contract, was the agreement of no effect because of the statute of frauds.

" 3. Whether, under the contract, there was an implied obligation on the part of the Mechling Company to exercise ordinary care, skill and economy in the manufacture of the sulphide, and, if so, were the master's findings that the Mechling Company did in fact exercise ordinary care, skill and economy in the manufacture of sulphide in the year 1908 inconsistent with the facts reported by him on which his conclusion is based.

" 4. Whether the Atteaux Company or the Mechling Brothers Company broke and repudiated the contract, the breach going to the essence of it.

" 5. If the Mechling Brothers Company is entitled to recover, in reckoning the damages for the period between the beginning of operations and April 1, 1909 (the date when the relations of the parties were severed), are they to be determined from the point of view of contract capacity or of actual output.

" 6. If the Mechling Company is entitled to damages for loss of profits after April 1, 1909, are they to be measured by the number of tons which the Mechling Company obligated itself to produce, assuming an ability commensurate with its undertaking, or rather by the number of tons which the Mechling Company, after that date, did in fact produce.

" 7. If the Mechling Company is entitled to recover, is it entitled to compensation for losses incurred in the operation of its plants after April 1, 1909."

Answering questions 1 and 2: We agree with the judge below and with the master that the contract was modified in the manner pointed out in the first question; and further agree that the agreement for the production of increased quantities of hypo and sulphide was sufficiently evidenced by the letters to meet the requirements of the statute of frauds. *Lawley & Son Corp.* v. *Buff*, 230 Mass. 21.

Answering question 3: It is the claim of the Atteaux Company that the Mechling Company unreasonably delayed the production of the sulphide; that such delay resulted in damage to that company; that the high cost of manufactur-

ing the sulphide, resulting ultimately in the rupture between the parties, was due to lack of reasonable economy and prudence in manufacture; and inasmuch as the rights of both parties under the contract are intimately concerned with the matter of cost, it is but just that the rights and liabilities should be determined in the light, not of actual cost but of what the cost would have been had ordinary care, prudence and economy been exercised. The master found that the Atteaux Company by its subsequent conduct had waived any right to terminate the contract or to refuse performance on this ground, although it did not waive its right, if any, to damages, which he finds are largely conjectural. He found that the Mechling Company in the building of the sulphide plant and in the production of sulphide acted in good faith, with reasonable degree of economy and prudence under all the circumstances, but if it is to be held to the highest standard of skill to be expected of fully qualified experts in the construction of sulphide plants, that performance falls far short of the requirements of such a standard. In this regard we agree with the position of the judge below which he states as follows: " If the high cost of the sulphide, judging it by an external test or standard, i. e. by the ordinary care, prudence and economy customarily used by other manufacturers, was due to the lack of such ordinary care, prudence and economy, my ruling is as follows: Viewing the contract in its entirety, if the Mechling Company, in manufacturing this product, exercised good faith, was actuated by an honest purpose to produce it as economically and at as low a cost as was consistent with the manufacture of a merchantable article of good quality, and was wholly uninfluenced by any consideration that the greater the cost the greater would be its profit, then it is not open to the Atteaux Company to show that during the period when both parties were acting under the contract, and before its breach, that the cost would have been less if the Mechling Brothers Company had exercised that ordinary care, prudence and economy usual among other manufacturers. This construction seems to be required by the language of the contract, especially of the several clauses relating to the manner in

which the profits of the Mechling Company shall be computed, and the rules for governing the arbitrators in the event that differences arise in respect to costs or profits."

Answering question 4: We agree with the finding of the master that the refusal of the Atteaux Company to abide by the ten per cent clause of the contract was a repudiation in fact of that contract, which was a breach going to the essence of the contract, and we agree with the judge below that such breach went to the essence of the contract relieving the Mechling Company from further performance and subjecting the Atteaux Company to damages. *National Contracting Co.* v. *Vulcanite Portland Cement Co.* 192 Mass. 247.

As to question 5: The master finds that whatever the capacity for production, the Mechling Company voluntarily and intentionally refrained from producing much in excess of the anticipated requirements to meet the orders of the Atteaux Company and did not assert its right to produce to its full capacity or to require the Atteaux Company to sell to that capacity. We agree with the judge below that this was the limit of the waiver at the time of the breach. The Mechling Company's right thereafter to require the Atteaux Company to dispose of its product at the total contract capacity was unaffected and in full force, which was also true of its right to the guaranteed ten per cent profit on the hyposulphite and sulphide which it actually manufactured and shipped during the period in question. Following strictly the processes which the contract prescribes for computing the ten per cent profit, the master finds that on the hyposulphite and the sulphide account from the beginning of operations until April 1, 1909, the total deficit for which the Atteaux Company is responsible is $14,868.74.

Answering question 6: We adopt the opinion of the judge below, which states clearly and accurately the issues between the parties, and the proper legal conclusion which should be drawn therefrom:

" The loss of prospective guaranteed profits was plainly within the contemplation of the parties as the probable result of a breach, was the natural and probable consequence of the breach, and was susceptible of reasonably certain and satisfactory proof.

" The Mechling Company agreed to produce an average of twenty tons of hyposulphite of soda and ten tons of sulphide per day, and the Atteaux Company agreed to sell those quantities at prices which would net at least an average of ten per cent profit to the Mechling Company for the period of the term of the contract upon the amount of all sales. That is, as I view it, the words ' whole output ' in the second clause of the contract are defined and limited by the fifth clause, which specifies the number of tons which the Mechling Company shall produce.

" If the Mechling Company, from April 1, 1909, to the end of the contract period, could produce twenty tons of hypo and ten tons of sulphide per day (as the master finds it could), it is necessary to ascertain what prices the Atteaux Company could have obtained throughout this period at the total contract capacity. The Mechling Company (speaking now entirely without reference to the Atteaux Company's guaranty to make good any deficiency in profits) would be entitled to ten per cent on the amount of the sales. This amount can be ascertained with reasonable accuracy from those portions of the report printed below. But the Mechling Company was not entitled to be put in a better position by reason of the breach than it would have been in if the Atteaux Company had carried out the contract. (*Magnolia Metal Co.* v. *Gale*, 189 Mass. 124, 132.) From any sum which the Atteaux Company could have earned for the Mechling Company, if the former had carried out its contract, must be deducted whatever the Mechling Company reasonably could have earned through its own efforts or the agency of others, if, when the breach occurred, it had proceeded to carry out the Atteaux Company's undertaking. See *Drummond* v. *Crane*, 159 Mass. 577. At the time of the breach it was equipped with an adequate plant and ample facilities for the manufacture of twenty tons of hyposulphite and ten tons of sulphide per day, and was actively conducting the going business of producing these chemicals in large quantities. It is not suggested that because Atteaux and Company refused to go on with the sale of the Mechlings' products, that the Mechling Company it-

self or through the agency of others could not have sold them at total contract capacity for the remaining period of the contract, and there is nothing in the master's report which intimates that if it had sold them, the Mechlings or their agents could not have obtained as good prices as the Atteaux Company would have obtained. For the purpose of determining damages, such prices as reasonably could have been obtained must be treated as if in fact obtained. While the master reports that he cannot find with certainty that the Atteaux Company could have sold the entire output (meaning, I assume, at total contract production) either of hypo or sulphide, he does not find with certainty that it could not have sold the entire output, nor that the Mechling Company could not have sold it, and the burden of proof as to damages in all aspects is upon the Mechling Company. Consequently, and still without regard to the matter of the guaranty against deficiency in profits, the Mechling Company has suffered no loss in that the Atteaux Company, if it had carried out the contract, would have earned more for the Mechling Company than the Mechling Company could have earned for itself.

" If, however, the sale of these products, at the total contract capacity, would not yield the full profit guaranteed by Atteaux and Company, then Atteaux and Company is liable for the difference.

" In this connection the master finds as follows:

" ' If the court should consider that the Mechling Company is entitled to damages and that it is entitled to recover among other items such profits after April 1, 1909, as can be found with reasonable certainty, I find as to hypo that the Mechling Company could have produced twenty tons a day for the balance of the contract period. I find with substantial certainty that the average cost of capacity production, including overhead and packages, but not including commissions, would have been as much as $1.01 per one hundred pounds in 1909 and 1910, ninety-nine cents in 1911, and ninety-six cents in 1912, and, if material, these costs would have been reasonable. I cannot find with substantial certainty that the cost would have exceeded

these figures. I can also find with substantial certainty that the profits would not have exceeded the guaranteed 10% even with no allowance made for selling commission, and that the selling price on which the 10% profit would have been computed would not have been less than $1 per one hundred pounds. I cannot find with certainty that the Atteaux Company could have sold the entire output.

" ' Upon the same hypothesis, I find as to sulphide that the Mechling Company could have produced ten tons a day for the balance of the contract period. I find with substantial certainty that the average cost of capacity production, including overhead and packages, but not including commissions, would have been as much as $1.01 per one hundred pounds in 1909, and $1.07 in 1910, 1911 and 1912, and, if material, these costs would have been reasonable. I cannot find with substantial certainty that the cost would have exceeded these figures. I find with substantial certainty that the profits would not have exceeded the guaranteed 10% if selling commission were included in the cost. If selling commission were not included in the cost, there might have been a slight excess over the 10% in 1909, but not in the subsequent years, and the possibility of excess in 1909 is too slight to be taken into account. The selling price on which the 10% is to be computed would not have been less than $1.10 per one hundred pounds. I cannot find with certainty that the Atteaux Company could have sold the entire output.

" ' If the hypo plant had been run to capacity after May 1, 1908, and the sulphide plant after October 1, 1908, there would have been a saving in cost of production of at least five cents per one hundred pounds on hypo and on sulphide probably considerably more in 1908, while in 1909 there would have been a saving in cost of sulphide and the hypo costs would not have exceeded the costs for 1908. If, under these circumstances, the Atteaux Company had succeeded in marketing the whole output at prevailing prices there would have been no operating loss on hypo and the hypo sales would have yielded the Mechlings very nearly their 10% profit if the Atteaux Company were paid

no commission, but not otherwise. In sulphide there would have been an operating loss in 1908, but not during the first three months of 1909. In those latter months, however, the profits on sales of sulphide would have been slight and could not have exceeded the 10% even without paying the Atteaux Company's commission.'

" The burden of proof was on the Mechling Company to prove the extent of its damages, and when the master says, with reference to both hypo and sulphide, that he can find with substantial certainty that the profits would not have exceeded the guaranteed ten per cent, even with no allowance made for selling commission, I treat this as the equivalent of saying that he does not find that the profits would have been less than the guaranteed ten per cent, with no allowance made for selling commission.

"The master's report shows an operating loss in respect to both hypo and sulphide after April 1, 1909, the date of the breach. But the Mechling Company was then producing on a very much smaller scale than the total contract capacity. The sales which they made after the breach and their loss of profits had some bearing, of course, on the value of their contract and the amount of their damages (*Loughery* v. *Huxford*, 206 Mass. 324), but the report clearly discloses that it would have cost the Mechlings very much less per ton to manufacture twenty tons of hypo per day than the six or seven tons which it put out after the breach. If the Atteaux Company is to be held on the basis that it was obliged to dispose of twenty tons of hypo per day, then the cost, which is the factor from which the profits are to be determined, must be reckoned as for twenty tons per day, instead of six or seven, the amount actually produced. The same consideration applies to sulphide, which was manufactured after the breach in an almost negligible quantity.

" The report shows that the amounts which could have been earned annually at total capacity production, either by the Mechling Company or the Atteaux Company, are somewhat less than the amounts required to meet the guaranty. There remain to be determined, therefore (treating the amounts which at total capacity production the master

finds could annually have been earned, as if they had actually been earned), the sums which would have been annually required to make up the deficit in the guaranteed profits.

" The capacity production of hypo from April 1, 1909, to December 31, of that year, was nine million pounds. This quantity could have been sold during that period, as the master finds, at a price per hundred pounds, ten per cent in excess of $1.01, which was the average cost for that period at capacity production, exclusive of the selling commission. The average price, therefore, which could have been obtained for the total capacity production for the last nine months of the year 1909 was $90,900, which I assume does not include charges for freight and drayage. The selling commission would have been five per cent of this amount, viz., $4,545. By the terms of the contract, the selling commission was to be included in the cost, plus five per cent of the commission itself, and under the Atteaux Company's guaranty the Mechling Company was assured of ten per cent of this, as well as of the other elements of cost. Ten per cent of the selling commission, to which has been added five per cent of itself, is $477.23, and so far as can be reasonably estimated, is the sum to which the Mechling Company is entitled on account of the capacity production for 1909.

" For the year 1910, the cost per hundred pounds of hypo, as the master reports, exclusive of selling commission, would have been the same as in 1909. The capacity production for that year was twelve million pounds. The selling commission would have been $6,062. Adding five per cent of this amount to the amount itself, ten per cent of the whole is $636.50.

" Following the same process for the years 1911 and 1912, based on the probable earnings for those years, the deficits are respectively $685.07 and $665.28.

" In the matter of sulphide, the deficit for the year 1909, calculated in like manner, is $262.24, and for each of the years 1910, 1911 and 1912, $370.76.

" The total damages to which I find the Mechling Company entitled are $18,687.34, with interest from the date of the writ in the original action."

Answering question 7: The judge below ruled rightly that the Mechling Company is not entitled to recover for losses incurred in the operation of the plant after April 1, 1909.

It results that the decrees, interlocutory and final, must be affirmed.

*Decrees accordingly.*