**NORTHERN HEEL CORP., et al., Plaintiffs, Appellees,**

v.

**COMPO INDUSTRIES, INC., et al., Defendants, Appellants.**

Nos. 87–1422, 87–1423.

United States Court of Appeals, First Circuit.

Heard March 8, 1988.

Decided June 30, 1988.

---

John G. Fabiano with whom Cynthia O. Hamilton, Hale and Dorr, Boston, Mass.

and Daniel A. Laufer, Manchester, N.H., were on brief for defendants, appellants.

Martin I. Eisenstein with whom Brann & Isaacson, Lewiston, Me., was on brief for plaintiffs, appellees.

Before COFFIN, BREYER and SELYA, Circuit Judges.

SELYA, Circuit Judge.

After defendant-appellant Compo Industries, Inc. (Compo) negotiated a purchase and sale agreement (the Agreement) referable to the assets of plaintiff-appellee Northern Heel Corporation (Noheel), it failed to close and instead invited renegotiation of the sale at a reduced price.[1] Noheel declined the invitation, insisted that the closing should have gone forward as originally agreed, and brought suit. Compo counterclaimed. Following a two day Rule 65 hearing and a five day bench trial, the United States District Court for the District of New Hampshire found that appellant had cancelled the soiree in bad faith and breached the Agreement. *Northern Heel Corp. v. Compo Industries, Inc.*, No. C82–71 (D.N.H. Mar. 5, 1987) (*Noheel I*). The court awarded Noheel damages and counsel fees, and dismissed the counterclaims. On appeal, Compo continues to maintain that it was amply justified in removing the plaintiff from its dance card. We demur. The district judge's determination that defendant improperly stopped the music was, we think, borne out by the record.

We approach our task mindful of the fact that Compo, in its unremitting quest to validate its position, has left no forensic stone unturned. We deal, one by one, with what we perceive to be its central theses. In proceeding in this serial fashion, we discuss the facts (as the district court, supportably, could have found them) in the context of our treatment of defined issues.

---

1. Several other entities and individuals associated with Compo appear as additional appellants, including its wholly-owned subsidiary, Styletek Inc., its vice president, Robert J. Cobuzzi, and Styletek's vice president, David Kincman. Noheel's principals, Arthur, Gary, and Barry Sansoucie, appear as additional plaintiffs-appellees.

Because the presence of this cadre of extra parties adds nothing of substance, we treat Noheel and Compo as if they were the sole parties to the litigation and the appeals. Notwithstanding, our decision applies unreservedly to all parties of record.

The substantive law of Massachusetts governs: this is a diversity case, section 18 of the Agreement designates Massachusetts law as controlling, and New Hampshire traditionally defers to the "clearly expressed intention" of the parties as to choice of law in contract cases. *See Consolidated Mut. Ins. Co. v. Radio Foods Corp.*, 108 N.H. 494, 240 A.2d 47, 48–49 (1968).

## I. MISREPRESENTATION

Compo's flagship claim is that Noheel breached the Agreement (or, put another way, failed to fulfill express conditions precedent) by misrepresenting a variety of material facts, thereby giving appellant the right to withdraw from the deal. To place the point into historical context, we limn the progress of the parties' negotiations. Noheel, primarily but not exclusively a producer of heels for women's shoes, operated its business from facilities in Dover, New Hampshire and Lewiston, Maine. Compo's subsidiary, Styletek, was a competitor of Noheel. The parties began talking in earnest on August 4, 1981. During the ensuing discussions, appellee (largely through Barry Sansoucie) gave Compo, verbally, considerable information about its business (*e.g.*, gross margins, pricing formulae, manufacturing processes). It also furnished Compo audited financial statements for its fiscal years ended May 31, 1980 and May 31, 1981, respectively (and eventually, before the Agreement was signed, gave Compo a quarterly statement for the period ending August 31, 1981). Compo's representatives toured Noheel's plants. On November 4, Barry Sansoucie supplied voluminous documents to appellant (*e.g.*, price, customer, and vendor lists, salary data, information as to manufacturing costs, summarization of receivables) and, after many hours of discussion, the Agreement was signed on that date. It was drafted by Compo's counsel.

The instrument set a November 9 closing date, soon rescheduled to November 16, 1981 to allow adequate time to take the needed inventory and value the accounts receivable. (Under the Agreement, it was Compo's obligation to take the lead in these matters, subject to Noheel's right of audit.) But appellant's people did not arrive to take inventory on the appointed date, nor did appellant notify Noheel that they would not appear. With silence still reigning, Compo boycotted the scheduled closing. Through counsel, a summit meeting was set for the next day.

At the November 17 meeting, the balloon went up. Compo informed Noheel that the deal was dead because appellee had dealt deceptively. After announcing its withdrawal, Compo sought to renegotiate based on major concessions in the proposed purchase price. This was the first time that appellant told Noheel about any alleged misrepresentations, notwithstanding that Compo claims to have been aware of the critical information as early as November 5. Prior to repudiation, appellant neither requested clarification nor asked appellee to respond to its emerging concerns.

Before turning to specifics, we focus briefly on the contractual context. Compo was to pay Noheel dollar-for-dollar the value of the latter's inventory and accounts receivable as of the closing date, plus $616,000 for what we shall call "machinery and equipment." *See infra* note 7. But matters were considerably more complicated than appears at first blush. The Agreement was a lawyer's dream and a client's nightmare, bristling with conditions precedent. It included standard language that made the purchaser's obligations subject, at closing, to the truthfulness in all material respects of the seller's representations and warranties as contained in the Agreement. (It is this condition which Compo claims Noheel failed to fulfill, thereby relieving Compo of its obligation to perform.)

A fair reading of the terminology leaves no room to doubt that only material misrepresentations by Noheel would serve to rupture the Agreement, and Compo does not seriously contend otherwise. This understanding comports with Massachusetts law. To excuse repudiation by one party, the other's "breach" must be "total," that is, it must strike at the "essence" of the agreement. *See Imper Realty Corp. v. Riss*, 358 Mass. 529, 265 N.E.2d 594, 598 (1970);

Center Garment Co. v. United Refrigerator Co., 369 Mass. 633, 341 N.E.2d 669, 673 (1976); Bucciero v. Drinkwater, 13 Mass.App. 551, 434 N.E.2d 1315, 1317–18 (1982); see generally 4 Corbin on Contracts § 975, at 918 (1951). Thus, a party can disclaim a contract only when its repudiation rests upon the existence of facts which justify a failure to perform. Nevins v. Ward, 320 Mass. 70, 67 N.E.2d 673, 675 (1946); see Fitch v. Ingalls, 271 Mass. 121, 125, 170 N.E. 833 (1930). Succinctly put, for misrepresentation to warrant repudiation or rescission, the would-be escapee must show that misrepresentation occurred, that it was material, that it induced entry into the contract, and that it was relied upon, justifiably. Yorke v. Taylor, 332 Mass. 368, 124 N.E.2d 912, 914–16 (1955); Benjamin Foster Co. v. Commonwealth, 318 Mass. 190, 61 N.E.2d 147, 152 (1945); Fitch, 271 Mass. at 125, 170 N.E. 833. Neither a "slight" breach nor a nonmaterial misrepresentation permits a party to "throw[ ] the contract over." Center Garment Co., 341 N.E.2d at 673; see also Kaplan v. Suher, 254 Mass. 180, 182–83, 150 N.E. 9 (1926). Therefore, unless Noheel had been guilty of some material misrepresentation, Compo was obliged, under Massachusetts law, to perform.

■ Before proceeding further, we deal with a stalking horse of sorts. Compo attempts to characterize Noheel's conduct as a series of failures to satisfy conditions precedent, e.g., Appellant's Revised Brief at 12–13, rather than as breaches of contract. While the distinction might be significant in some cases—a topic on which we express no opinion—it is, for several reasons, purely semantic here.

For one thing, the basic condition upon which Compo relies—that Noheel's representations and warranties would be true "on and as of the Closing Date," Agreement § 7.1—is only nominally a condition precedent. We explain briefly. Under Massachusetts law, contracting parties may provide that performance is not required unless and until stipulated conditions precedent have been met. See Howland v. Plymouth, 319 Mass. 321, 65

N.E.2d 535, 537 (1946). A condition is customarily an undertaking on one side to do something (Thing One) which, by its terms, is made a condition to the performance of some corresponding obligation (Thing Two) by the other party, as where the latter agrees to do Thing Two if the former shall carry out Thing One. See Malden Knitting Mills, Inc., v. United States Rubber Co., 301 Mass. 229, 16 N.E.2d 707, 710 (1938); cf. Dr. Seuss [pseud.], The Cat in the Hat 33–54 (Random House ed. 1957) (discussing Thing One and Thing Two). In this case, the supposed condition precedent—the truthfulness at closing of seller's representations and warranties—reads more like a concurrent condition, inasmuch as the corresponding obligations (fulfillment of the condition and performance under the Agreement) all become due on the closing date. See 3A Corbin, supra, § 629, at 19. As the commentator acknowledges, the term "concurrent condition" is merely "an elliptical expression for a condition precedent where performances are due at the same time." Id. at 19 n. 21 (quoting Restatement ). If concurrent, ordinary principles of repudiation and breach control.

For another thing, Compo's refusal to take the inventory, assay the receivables, and go to closing deprived Noheel of the opportunity to demonstrate the fulfillment of the conditions precedent. This conduct on appellant's part, unless justified by some blameworthy behavior attributable to appellee, likely relieved appellee of any duty to fulfill the conditions. See Restatement (Second) Contracts § 245 (1979) (where party's breach by non-performance contributes materially to nonoccurrence of a condition to be satisfied by the other party, the nonoccurrence is excused); see generally Part II, infra, and cases cited therein; cf. Fortune v. National Cash Register Co., 373 Mass. 96, 364 N.E.2d 1251, 1258–59 (1977) (breach of implied covenant of good faith and fair dealing excuses other party "from performance of conditions imposed"). The law should not be construed idly to require parties to perform futile acts or to engage in empty rituals. As we see it, the perpetrator in the circumstances which we posit forfeits any right to

disclaim the contract because of the victim's failure to satisfy conditions precedent. In short, an aggrieved seller need not go through a myriad of meaningless motions in order to bring a defaulting purchaser to account. If it failed to afford Noheel the bargained-for opportunity to satisfy conditions precedent, Compo cannot be heard to complain in its defense that those very conditions did not materialize.

Our third point is, we think, dispositive. Section 7 of the Agreement speaks not to the abstract fulfillment of conditions precedent, but to their fulfillment "in all material respects." Thus, the theories of breach (Noheel breached by materially misrepresenting matters) and failure to satisfy the section 7.1 condition (Noheel fell short because its representations were materially untrue) coalesce. If viewed as a matter of repudiation and breach, only material misrepresentations by Noheel would serve to excuse Compo's nonperformance. *See supra* at 460–461. If viewed as a matter of a prefatory condition, only material failure of fulfillment—in the case of section 7.1, material misrepresentation—would serve to excuse Compo's nonperformance.

In the final analysis, then, all roads lead to Rome. Appellant's "condition precedent" argument is strictly an exercise in logomachy. If the height of a ship's superstructure prohibits clearance, it makes little difference to the pilot whether one raises the height of the bridge or lowers the level of the water to effect the necessary adjustment. So here: for plaintiff's conduct to constitute a legally cognizable justification adequate to excuse Compo's renunciation, it would have to measure up (or, more aptly, down) to the same dimensions whether seen as a matter of ordinary breach or as a matter of the failure of conditions precedent.[2]

With this prelude, we turn our attention to the claims of misrepresentation and the findings made in the court below. In doing so, we remain mindful of the command of

Fed.R.Civ.P. 52(a) that, in a bench trial, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." We have repeatedly stressed that this criterion is a deferential one, *see, e.g., RCI Northeast Services Division v. Boston Edison Co.*, 822 F.2d 199, 201–03 (1st Cir.1987); *In re Tully*, 818 F.2d 106, 108–110 (1st Cir.1987), and the point requires no further elaboration.

### A. *Agency Communications*

Section 3.24 of the Agreement required Noheel to deliver to Compo, prior to closing, "copies of all correspondence and other communications received by [Noheel] from or addressed by it to any governmental agency or instrumentality ... pertaining to the Assets or the operation of [the] business." Appellant contends that Noheel trammelled this covenant by its failure to disclose communiques it exchanged with two federal agencies, the Occupational Safety and Health Administration (OSHA) and the Economic Development Administration (EDA). We inspect each claim independently.

■ 1. *OSHA Nondisclosure.* OSHA, it seems, cited Noheel for certain violations in mid 1979. By the end of October of that year, the listed violations had been cured and fines, totalling $480, paid in full. Because the citation had been satisfied, Noheel in 1981 was not "subject to or in violation of or in default with respect to" the same, Agreement § 3.6, and was not required to disclose it by reason of that section. Nor was there evidence to suggest that, during negotiations with Compo, appellee was aware of, or cited for, any current problems. Indeed, the OSHA inspection most proximate to the date the Agreement was signed—conducted in early 1982—discovered not a single infraction.

---

**2.** For this reason, and for simplicity's sake, we will henceforth refer to the claimed misrepresentations mainly in the idiom of breach. Our comments, however, apply with equal force— and demand the identical result—if the same matters are deemed to come within the condition precedent rubric.

The relevance to Compo, *qua* prospective purchaser, of writings which concerned only previously-corrected conditions defies rational explanation. The district court (understandably, we think) found this remonstrance to be "nit picking at its best." *Noheel I* at 8. The record wholly supports the conclusion that the communications between OSHA and Noheel, though not disclosed, need not have been. They were altogether immaterial to the transaction.

■ 2. *EDA Nondisclosure.* Appellant likewise suggests that appellee breached the Agreement when it neglected to turn over its EDA file. On the evidence presented, however, the district court was entitled to find that Noheel applied for trade adjustment assistance (TAA) from the EDA on April 8, 1980, and received word three months later that it was eligible for such aid. Nothing else transpired for over two years. In August 1982, after Compo had scotched the planned acquisition, Noheel renewed its TAA request. Thus, during the period when the deal was alive, the TAA issue was not.

It is hard to imagine the materiality of a dormant request, especially since, as the district court pointed out, it was "a matter of common knowledge ... that the New England shoe industry in the past two or three decades" had fallen upon impecunious times. *Noheel I* at 8. The record shows that Compo was well aware of appellee's overall financial condition and prospects, and knew that in the 1980–81 time frame domestic shoe companies were feeling the pinch of foreign imports—the very sort of discomfiture which prompted Noheel to approach the EDA. The sockdolager, of course, is that Noheel did not follow through on the application, pledge or encumber any assets, accept any subsidy, or make any meaningful commitments. "Materiality," we think, is not what a disappointed party says it is; rather, it demands an objective cross-matching of the significance of a fact to the essence of the

transaction in question, and requires a plausible showing of the potentially adverse effect of the former on the latter. *See United States v. Ven–Fuel, Inc.*, 758 F.2d 741, 762 (1st Cir.1985). Given the circumstances of this case, we cannot criticize the district court's determination that the EDA paperwork was inconsequential.

### B. *Employee Bonuses*

Around 1979, Noheel paid $2,264.50 to the University of Maine for the college tuition of an employee's daughter. This was a rarity; the firm was not shown to have paid tuition for an employee or an employee's relative on any other occasion. The following year (1980) was a particularly profitable one. That November, Noheel gave Thanksgiving turkeys to 20 of its 120 employees. The next month, it conferred cash bonuses on 17 workers, 2 of whom also received further bonuses in June 1981. The bonuses totalled $7,450 in 1980 and $1400 in 1981. Appellee also let certain workers take company vans home overnight. It did not inform Compo of any of this largesse when the Agreement was signed, and appellant contends that Noheel's silence constituted misrepresentation. The district court disagreed and so do we.

■ The mewlings concerning the solitary tuition reimbursement and the nocturnal use of corporate vehicles are so farfetched as not to require extended comment.[3] As to the bonuses, Compo claims they should have been disclosed. Its argument derives from Noheel's warranty that, except as revealed, it was "not a party to any written or unwritten ... express or implied ... bonus ... or similar plan or practice, formal or informal, in effect with respect to ... employees...." Agreement § 3.15; *see also* § 3.19(b) & schedule (requiring listing of agreements for employee benefits). We see no foul—or in the case of the turkeys, fowl—play.

---

**3.** As to vehicular use, the district court found that one or two vans "were taken home ... to eschew vandalism," a circumstance which the court believed was no employee fringe benefit but "veritably to the company's advantage." *No-*

*heel I* at 9. As to the year's tuition, the court brushed it aside as "picayune." *Id.* at 10. These colorfully-expressed conclusions derive satisfactorily from the record.

In the first place, section 3.15 requires revelation not of any bonuses but of any "plan or practice" referable to bonuses. No evidence was presented to indicate that the bonuses in question were paid regularly or in pursuance of a set formula, or that poultry was passed out periodically. It would, therefore, take linguistic license far too permissive for our taste to characterize the emoluments as part of a "plan" or a "practice." *Cf. Webster's Ninth New Collegiate Dictionary* 898 (defining "plan" as, *inter alia,* "an often customary method of doing something ... a detailed program, as for payment or the provision of some service"); *id.* at 923 (defining "practice" as, *inter alia,* "a repeated or customary action ... the usual way of doing something"). A glance at the type of things which Noheel listed in the schedule accompanying section 3.15 indicates full well that the parties understood "plan" and "practice" in the usual sense; the schedule showed, for example, a hospitalization plan, a term life insurance plan, and a workers' compensation plan.

Two other provisions of the Agreement also lead us to conclude that the parties never envisioned a need for disclosure of items like these single-shot employee bonuses. Section 3.8—in which Noheel warranted in substance that certain actions had not been taken since May 31, 1981—explicitly excepted "customary employee or officer bonuses." And section 6.5 required appellee to terminate all employees as of the closing date, with Noheel remaining responsible for any accrued pay or benefits. Compo was neither bound to continue employing Noheel's work force nor to pay former Noheel employees bonuses in the future. Courts need not ignore the obvious. There was in this case insufficient evidence of the existence of any "plan" or "practice" such as would warrant imposition of a disclosure obligation.

Before leaving this subject, we remark the modest amount of money involved in the bonuses. The aggregate dollars were minimal relative to the transaction value, implicating less than $10,000 (turkeys included) in a deal which had a price tag of approximately $1,200,000. Given the simple arithmetic of the matter, Noheel's failure to tell Compo of the payments could scarcely be considered material. *Compare, e.g., Bucciero,* 434 N.E.2d at 1317–18 (refusal to pay roughly $84,000 not so material as to amount to total breach, where aggregate contract price exceeded $1,600,000).

## C. *Production Records*

■ Section 3.22 of the Agreement required Noheel to make available to Compo production records for a three year period, if it had any. Noheel said that it did not keep such records and, therefore, delivered none. This disclaimer, appellant trumpets, was materially false because, as it first learned after the Agreement was signed, Edward Brisard (a foreman at the Dover plant) had kept handwritten notes concerning production at that facility between May and December 1981. Inasmuch as this interval fell within the three year disclosure period, these "production records" should have been turned over.

Having advanced an argument that calls for red meat and strong drink, appellant offers us stale bread and tepid water to nourish it. Brisard's jottings were remarkably unimpressive. We recount the reasons. By and large, the molding machines were not equipped with "counters" or other means of recording production rates mechanically. Brisard's figures were informal; as he testified, they were "very crudely" drawn. With regard to the number of heels molded per day, his enumeration derived partially from estimates (of uncertain reliability) furnished to him by the employee who oversaw the molding department at Dover. There was evidence that, in many instances, Brisard's count was likely low by as much as 25%. Moreover, his notes were skeletal; they did not, for example, include any figures from the Lewiston factory. Finally, the notetaking was altogether Brisard's own idea: his duties were in the finishing department, not the molding department, and his scrivening was unauthorized. The evidence was uncontradicted that Noheel's management never knew of the existence of Brisard's charts. This circumstance is of overriding importance: if a

company can be bound by unofficial, unauthorized "records," offhandedly compiled and kept in a clandestine manner without management's knowledge or assent by a low-level supervisor from a different department, then few—if any—corporate representations of this genre could ever safely be proclaimed.

After assaying these and other (related) facts, the district court found that Noheel did not maintain any production records as such, but instead extrapolated needed production information from other sources, such as sales data. *Noheel I* at 10. It rejected the testimony proffered by appellant on this point as unworthy of credence and determined that Brisard's papers were unreliable and did not comprise "production records" of Noheel. *Id.* at 10–11. These assessments were fully sustainable on this record. Accordingly, there was neither a misrepresentation nor a proven breach of section 3.22 of the Agreement.

### D. *Business Downturn*

This initiative, which pivots off representations described below, has two prongs. We examine them independently.

■ 1. *Downturn in Production.* Appellant asserts that statements which Noheel made during the course of the negotiations were untrue and misleading. These statements concerned the firm's ostensible manufacture of 18,000 pairs of shoe heels per day on average. "Not so!" Compo exclaims. It urges that such mendacity masked a precipitous decline in Noheel's financial health after May 31, 1981 and concludes with a flourish: appellee was required to—and did not—disclose this deterioration. *See, e.g.,* Agreement § 3.28 (representation that since May 31, Noheel "has been accepting ... orders at a rate consistent with that of fiscal year 1981"); *id.* at § 3.9 (representation that since May 31 "there has been no change which materi-

ally and adversely affects [Noheel's] business, ... financial condition or prospects"); *id.* at § 7.5(b) (Agreement conditioned that, before closing, Noheel's business and prospects "shall not have been materially adversely affected"); *id.* at § 7.11 (same, anent seller's disclosures having "a materially adverse effect on the value of the business").

Close perscrutation of the record strongly suggests that a herring of a distinctly rubicund hue is swimming in these troubled waters. The district court found that, during negotiations, Barry Sansoucie stated that his company's "capacity" was 36,000 pairs of shoe heels per day, that it "was operating at 60% of capacity, and that approximately 10% of its capacity was dedicated to non-heel items." *Noheel I* at 10. Taken literally, that could mean a level of operations equivalent to 18,000 pairs of shoe heels daily. But the court went on to hold that the misrepresentation claim, in this respect as in others, was meritless. *Id.* at 11. For three main reasons, we find no clear error.

First, there were no accurate manufacturing records from which levels of production could have been discerned. *See supra* Part I(C). If Brisard's fragmentary jottings had pertinence at all, they tended to show that, on many days, production exceeded 18,000 pairs of shoe heels at Dover alone (reaching upwards of 26,000 on at least one day). The record supports the view that defendants failed to illustrate any material difference between fiscal 1981 and the next six months vis-a-vis the overall rate at which Noheel was processing product or receiving orders. Second, Compo's key decisionmaker, Kincman, admitted at trial that he had no concrete information to indicate that in the base year—fiscal 1981—Noheel's average daily production was less than 18,000 pairs of shoe heels.[4]

---

4. Indeed, Kincman's testimony could be read, in part, as an indication that Noheel's sales during 1980–82 exceeded 18,000 pairs of shoe heels daily on average, thus furnishing the basis for a powerful inference that daily production during the period was maintained at or near that level (as Barry Sansoucie had claimed). *See* Record

Appendix at 1021–24. Kincman testified that he considered "240 workdays" as comprising a production year. *Id.* at 1022. If Noheel produced 18,000 pairs of shoe heels per day over the course of such a year it would have manufactured 4,320,000 pairs annually. Kincman conceded that, according to defendants' Exhibit P,

This, too, would sustain a finding of the requisite consistency between the base year and the ensuing period.

Although these two pillars of support seem very solid, the final leg is, we think, equally sturdy. Notwithstanding what may have occurred in the course of the negotiations, the Agreement as executed contained no warranties at all in respect to daily production levels—but it did contain an integration clause which provided in relevant part:

> This Agreement ... represent[s] the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and, therefore, supersede[s] all prior negotiations between such parties....

Agreement § 16. Had the parties deemed average daily production important ("material" to the deal), surely an appropriate reference would have been included. But, it was not.

In our view, this drains any remaining vitality from Compo's asseveration. "It is unbefitting that we accomplish by judicial fiat what [a party] neglected to achieve contractually." *RCI Northeast Services Division*, 822 F.2d at 204. We decline to rewrite the agreement between the parties to include a representation which they were mutually content to let slide in the course of their negotiations. *See Mathewson Corp. v. Allied Marine Industries, Inc.*, 827 F.2d 850, 856 (1st Cir.1987) (where "the transaction is commercial, the principals practiced and represented by counsel, and the contract itself reasonably clear, it is far wiser for a court to honor the parties' words than to imply other and further promises out of thin air") (applying Massachusetts law); *New England Structures, Inc. v. Loranger*, 354 Mass. 62, 234 N.E.2d 888, 893 (1968) (refusing to imply a contract term in circumstances where it "would have been natural for the parties to

have provided expressly [for the term] if that had been the[ir] purpose").

█ 2. *Other Material Adverse Changes.* The second wave of this attack likewise crests with the representations contained in sections 3.9 and 7.5(b). Compo contends, generally, that the business sank like a stone between May 1981 and November 1981. Specifically, Noheel is said to have misrepresented its potential yearly gross revenues as being in the $2,000,000–$2,500,000 neighborhood. But the evidence, at least on one allowable view, showed otherwise.

There was proof that sales were up, appreciably, over the comparable six month period June–November 1980. Revenues during the month before appellant reneged exceeded $200,000. Annualized, this indicated yearly revenues equal to, or more than, the "potential" of which Barry Sansoucie allegedly boasted. To be sure, after the repudiation, appellee's business took a turn for the worse, and fiscal 1982 wound up at a substantially lower plateau. Yet this was easily explainable. Noheel's affairs had been significantly disrupted by Compo's revolving door tactics. Furthermore, the putative acquirer, now armed with reams of Noheel's most intimate commercial secrets, had resumed the cudgels as Noheel's competitor. It is small wonder that appellee's business tailed off. As the district court concluded, the "actions of the defendants were probably the reason [appellee's sales goal] was not obtained." *Noheel I* at 11.

The trial judge did not commit reversible error in finding that plaintiff's sales, production, and order rates were not actionably misrepresented, and that its financial circumstances did not deteriorate in a materially adverse fashion between May 31, 1981 and the date when Compo renounced the Agreement.

---

Noheel produced 5,507,000 pairs of shoe heels during the fiscal year ended May 31, 1980, 4,653,000 during fiscal 1981, and 4,482,000 during fiscal 1982. *Id.* at 1023–24. These figures, in and of themselves, support a finding that production during the period June 1, 1981 through May 31, 1982 (including the interval between the signing of the Agreement and Compo's recantation) was (a) at an 18,000 pairs-per-day average, (b) at much the same rate (certainly not materially worse) as during the preceding fiscal year, and (c) in line with the oral representation attributed to Barry Sansoucie.

### E. The SBA Loan

On August 6, 1981, within days after Noheel's first meeting with appellant, it borrowed $72,000 from the United States Small Business Administration (SBA), secured by a lien on inventory and accounts receivable. Compo alleges that it was not told of this loan and equates this omission to a misrepresentation under the Agreement:

> Except as and to the extent reflected in the [furnished financial statements] or as set forth in [the appropriate schedule], Seller does not and on the Closing Date will not have any liability or obligation, secured or unsecured, whether accrued, absolute, contingent or otherwise.

Agreement § 3.5. See also §§ 3.7(b), 3.13. Although the loan was not listed on the schedule, the district court found that it appeared as part of the furnished financial statements, more particularly, the quarterly balance sheet and income statement for the period ended August 31, 1981, a copy of which was supplied to Compo. Noheel I at 7. Since the clause was written in the disjunctive, section 3.5 was, therefore, unsullied. And in any event, the court found explicitly that, at the critical dates, "Compo was aware of the outstanding loan." Id.

■ These findings, we think, enjoy adequate record support. The evidence showed convincingly that, shortly after August 31, Noheel produced an interim statement (balance sheet and related statement of income) for the quarter ended August 31, 1981. It was required to provide this statement to Compo under section 3.4 of the Agreement. Cobuzzi admitted receiving a quarterly statement, likely on the night the Agreement was signed. The record reveals that both a handwritten draft of the quarterly statement and a printed version of it were extant. The former did not show the loan; the latter arguably did. Although the matter is far from cut and dried, the record sustains an inference that the quarterly statement Noheel printed was received by Cobuzzi. Even so, the purport of that statement is not entirely clear; it is debatable as to whether it adequately reflected the loan. But we can-

not say that the district court's finding that "[t]he SBA note appeared [thereon]," Noheel I at 7, was clearly erroneous.

■ For the sake of completeness, another series of observations is in order. Compo claims that even if Noheel did disclose the loan in the quarterly statement, the Agreement required that any liability which was not reported in the last previous annual financial statement had to be set forth in schedule 3.5, and that disclosure via the quarterly statement was insufficient. Assuming arguendo that Compo's reading of the Agreement is correct—a matter on which we express no view—Noheel's failure to include the liability in the schedule seems of little moment. The fact that appellant knew of the loan independent of the schedule (according to the district court's factfinding) necessarily rendered the omission nonmaterial. Furthermore, under section 2.1 of the Agreement, appellee was obligated to deliver all of the purchased assets free of liabilities, liens, and security interests, ergo, free of the $72,000 liability. There was no indication that Noheel was unprepared to pay off the SBA loan at the closing and fulfill this obligation to the letter. It was, of course, prevented from doing so by appellant's unwarranted refusal to tender performance.

### F. OSHA Compliance

When the deal was structured, Noheel warranted that its buildings and workplace were sound and in compliance with all applicable laws, ordinances, and regulations (including OSHA). See Agreement §§ 3.6, 3.17. Compo had a professional engineer, Arthur White, inspect the leased facilities. White discovered what he claimed were safety hazards costing approximately $20,000 to correct (e.g., inadequate sprinklers, problems with emergency lighting and fire escapes, poor ventilation). The district court allowed White to testify as to what he saw, but refused to permit him to match observed conditions with applicable OSHA regulations. Two questions arise. First, we must consider whether the judge was obliged to allow White to testify about OSHA violations per se. No matter how

this question is answered, we must then delve into the merits of the misrepresentation claim (and if we have found the witness's testimony to have been unduly restricted, we must decide whether the error was harmful).

■■■■ 1. *The Evidentiary Ruling.* District courts may exclude expert opinion which purports to embrace legal standards in a variety of circumstances, such as when the testimony would likely fail to assist the trier. Fed.R.Evid. 702. *See generally Karns v. Emerson Electric Co.,* 817 F.2d 1452, 1459 (10th Cir.1987). In reviewing judgment calls of this nature, we are careful not "to place unnecessary constraints on the discretion of the trial court." *DaSilva v. American Brands, Inc.,* 845 F.2d 356, 361 (1st Cir.1988).

The record suggests that the district court was concerned that permitting White to testify as to his interpretation of specific OSHA regulations would shed more heat than light. The court did, however, grant reasonable latitude. White was allowed to describe observed conditions and to testify that he had reported to Compo his opinion that the deficiencies which he spotted violated OSHA standards. The judge also permitted Cobuzzi, in attempting to show appellant's bona fides, to state his belief that OSHA violations were present. Thus, appellant was able to adduce the basic factual predicate for its position. The OSHA regulations themselves were subject to judicial notice. *See* Fed.R.Evid. 201. The judge was hearing the case jury-waived. Under these circumstances, it seems entirely plausible that White's testimony as to the "legality" of specific conditions or the "meaning" of particular regulations would not have assisted the trier of fact in any significant way.

All in all, the evidentiary ruling seems to pass muster. As we have consistently held, a trial judge has wide discretion in the admission or exclusion of opinion evidence. *E.g., DaSilva,* at 360–62; *United States v. Hoffman,* 832 F.2d 1299, 1310 (1st Cir. 1987); *Ricciardi v. Children's Hospital Medical Center,* 811 F.2d 18, 25 (1st Cir. 1987). This discretion, expansive in all events, is at maximum girth in the context of a bench trial. We reverse exclusionary rulings only for manifest—and damaging— error. *Independent Nail and Packing Co. v. Mitchell,* 343 F.2d 819, 823 (1st Cir.1965).

There was no noticeable bevue here. The court, not the self-professed expert, was the finder of the facts and the arbiter of the law. It was free to accept or reject White's supposed expertise. The decision not to permit the witness to pontificate on his interpretation of the regulations was a routine exercise of discretion.[5]

■■■■ 2. *Misrepresenting Condition of Workplace.* This misrepresentation claim, as Compo has presented it both below and on appeal, depends largely on proof that, contrary to Noheel's representation and warranty, its business premises did not conform to OSHA requirements. The merits of the claim need not occupy us for long. The district court found that no

---

5. Because it was within the trier's discretion to reject this testimony, we need not dwell upon the district court's alternative reason for excluding it. We have, however, satisfied ourselves that the proffered testimony was, as the court below ruled, not fairly disclosed to Noheel in the course of pretrial discovery. Compo held White out as expected to testify regarding safety and health conditions at appellee's plants, without giving any real clue that the witness would be offered as an expert anent OSHA's convoluted regulatory scheme. District judges, of course, have power, in the exercise of sound discretion, to bar or limit testimony when a party fails to comply fully with valid discovery requests. *See Doe v. Gaughan,* 808 F.2d 871, 876–77 (1st Cir.1986); *Smith v. Ford Motor Co.,* 626 F.2d 784, 794 (10th Cir.1980), *cert. denied,* 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981); *Shelak v. White Motor Co.,* 581 F.2d 1155, 1158–60 (5th Cir.1978), *opinion after remand,* 636 F.2d 1069 (5th Cir.1981). In this case, the district court's finding that Compo had not adequately disclosed the substance of White's OSHA testimony possessed sufficient record support to buttress preclusion (especially given Noheel's facially plausible claim that it was surprised and unprepared to respond). Consequently—quite apart from any more substantive ground—excluding the evidence was a valid use of the court's discretion. *See Smith,* 626 F.2d at 797 (where plaintiff notified that defense expert would testify as to injuries, not causation, trial court could hold witness to that dichotomy at trial); *see also* Fed.R.Civ.P. 26(b)(4), 26(e)(1)(B).

OSHA violations existed at or near the time the Agreement was signed. We agree. Consider the following (largely uncontested) facts:

1. The problems which gave rise to the 1979 OSHA citation had been completely remedied. *See supra* Part I(A)(1).

2. There is no evidence that OSHA ever cited Noheel for any violations in or around November 1981. The most closely proximate OSHA inspection, according to the uncontradicted testimony of Barry Sansoucie, was conducted in early 1982. It resulted in a clean bill of health.

3. No other official body—say, an arm of municipal or state government or other federal agency—had accused Noheel of defects in its premises or workplace during the pertinent time frame.

Given these facts and the evidence of sound condition adduced by appellee at the trial (particularly the testimony of Barry Sansoucie), the district court's determination that Noheel had not contravened the operative provisions of sections 3.6 and 3.17 seems unimpugnable.

### G. *You Are My Sunshine*

Appellant next contends that Noheel should have warned it of grayish skies by disclosing the Sansoucies' 40% ownership of Sunshine Molding Corporation (Sunshine). Based in Florida, Sunshine fabricated shoe heel components. Some Sansoucie relations worked for Sunshine and were on appellee's payroll, a few pieces of Noheel's equipment (valued at approximately $400) were kept at Sunshine's facility, and the two companies did some business with each other. Compo hints that, in this case, ignorance was not bliss: keeping secret the flourishing Florida feather in the family's corporate cap amounted to a fraudulent misrepresentation and breach of the noncompetition warranty contained in sections 9.1 and 9.2 of the Agreement,[6] and thus to a failure of the section 7.1 condition precedent. Appellant also argues that section 3.3 was violated because the Sunshine scenario rendered misleading Noheel's representation that it "ha[d] no subsidiaries."

 We regard these assertions as bordering on the vacuous. No provision of the Agreement expressly or by fair implication required disclosure of the family's relationship with Sunshine, and nothing was misrepresented. Neither Noheel nor its majority shareholder, Arthur Sansoucie, held any Sunshine shares. Though there was some interlock—Barry and Gary Sansoucie, who together owned 4% of Noheel, controlled 40% of Sunshine—the Florida outfit was neither a parent nor a subsidiary of Noheel. None of the assets which were to be sold were owned by Sunshine. Compo was committed to continuation of neither the vendor-vendee relationship with Sunshine nor the employment of the Sansoucie family members who worked there.

 In the context of an anticipatory repudiation, the noncompetition covenants were altogether beside the point. They were not to take effect until the closing—a closing which, because of appellant's premature withdrawal, never occurred. There was no reason whatever to believe that Sunshine, or any of the family members, would remain active in the shoe industry in Florida after that date, or that the covenants—if and to the extent applicable— would have been disregarded *in futuro*. (Indeed, evidence was received at trial indicating that the members of the Sansoucie family had planned to sell their interests in Sunshine as of the closing date.) Certainly, the avowed fear that such a chimerical possibility might come to pass was the rankest speculation and could not justify pulling the rug from under the Agreement. If seen as conditions to the transaction, the time for appellee to fulfill them never arrived. If seen as standard contractual obligations, the same analysis obtains. In either event, because appellant had not tendered its own due performance (*i.e.*, gone to closing), it had not activated the sellers' performance (*i.e.*, adherence to the noncom-

---

**6.** Those sections provided in substance that, for a period of three years after the closing date, Noheel and its shareholders (including Barry and Gary Sansoucie) would not compete in the shoe industry in the company's historic market area, Florida included.

petition terms) and could not, therefore, declare Noheel in breach. *See Bucciero,* 434 N.E.2d at 1318; *Limpus v. Armstrong,* 3 Mass.App. 19, 322 N.E.2d 187, 189 (1975); *see also Fauci v. Denehy,* 332 Mass. 691, 127 N.E.2d 477, 480 (1955); *Leigh v. Rule,* 331 Mass. 664, 121 N.E.2d 854, 857 (1954); 3A Corbin, *supra,* § 663; *Restatement (Second) Contracts* § 238 (1979).

### H. *Summing Up*

The last string to Compo's misrepresentation bow is the forlorn claim that, even if no single misrepresentation was sufficiently critical to justify walking away from the deal, the combined impact of the misrepresentations, in the aggregate, amounted to a material breach (or, if one will, a material failure of conditions precedent). Compo asserts, in effect, that the whole is greater than the sum of all the parts. In law as in more scientific disciplines, the theorem is impeccable. No less an authority than the Supreme Court has recognized that "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." *Bourjaily v. United States,* — U.S. —, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987). Yet in this case, the theory is not fed by the facts. As shown earlier in the text, virtually all of the "parts" upon which Compo relies are empty vessels. Except for a few obviously meaningless, *i.e.,* nonmaterial, omissions, there were no misrepresentations. The problem reduces, therefore, to an exercise in elementary mathematics: $0 + 0 = 0$. Put another way: $0 \times 0 = 0$.

Theoretical elegance notwithstanding, the argument founders. In this instance, the sum of the parts equalled the whole, and vice versa. No conduct attributable to Noheel, whether viewed in isolation or overall, whether labelled "breach of contract" or "nonfulfillment of conditions," justified appellant's withdrawal.

## II. WILLFUL FAILURE TO PERFORM

In the event of termination, the Agreement stipulated that liability for breach would inhere if the acquisition fell through by reason of "the willful failure of [a party] to perform...." Agreement § 13. The district court found such willful failure on defendants' part. It was persuaded that Compo's allegations of gross misrepresentation and shattered conditions were cobbled in order to bring pressure to bear and to exact major concessions on price. Accordingly, the court found that the repudiation was a sham, and "Compo without justification acted in bad faith and breached its contract...." *Noheel I* at 11. The court explained:

> Compo withdrew ... asserting violation of the agreement which in reality was a mere smoke screen to hide its machinations. Compo then attempted to negotiate a new agreement (at a lower price) with a party it was accusing of mercantile chicanery.

> Compo was not unsophisticated.... It surmised it had [Noheel] over a barrel, thus enabling it to negotiate at a lower figure.

*Id.* at 11–12. We scrutinize this determination only for clear error. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *RCI Northeast Services Division,* 822 F.2d at 202–03; *In re Tully,* 818 F.2d at 109–10. *See generally* Fed.R.Civ.P. 52(a).

We begin with an overview of the applicable law. We do not doubt that a party's completely unwarranted departure from a "done deal" would be a sufficient predicate for a showing of bad faith. *See, e.g., Druker v. Roland Wm. Jutras Assoc.,* 370 Mass. 383, 348 N.E.2d 763, 765 (1976) (party not allowed unilaterally and without justification to "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract"); *Malloy v. Coldwater Seafood Corp.,* 338 Mass. 554, 156 N.E. 2d 61, 65 (1959) (cancellation of agreement in order to deprive contracting party of commission would evidence bad faith); *see also Uproar Co. v. National Broadcasting Co.,* 81 F.2d 373, 376–77 (1st Cir.1936), *cert. denied,* 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed.

1393 (1936). Once a breach of significant magnitude has occurred, the injured party is excused from further performance. The Supreme Judicial Court has for many decades held that "a repudiation in fact of [a] contract, which [constitutes] a breach going to the essence of the contract ... reliev[es] the [other party] from further performance and subject[s] the [repudiating party] to damages." *F.E. Atteaux & Co. v. Mechling Bros. Mfg. Co.*, 245 Mass. 483, 498, 140 N.E. 271 (1923). *See also*, to like effect, *Cellucci v. Sun Oil Co.*, 368 Mass. 811, 331 N.E.2d 813, 814 (1975); *Leigh*, 121 N.E.2d at 857; 4 Corbin, *supra*, § 977; *cf. Fortune*, 364 N.E.2d at 1258–59.

In this case, the evidence of willfulness, and consequently bad faith, though circumstantial, was powerful. Compo's offer to renegotiate (for less money) followed hard upon its makeshift repudiation of the Agreement. The fact that its ostensible grounds for withdrawal were found, supportably, to be nonmaterial and/or thimblerigged, *see supra* Part I, furnishes the basis for a logical inference that appellant was determined to catch the nearest way, using whatever means—ulterior or not—were close at hand. The record lends credence to this inference in a stunning variety of ways. Compo had maneuvered its competitor well out on a limb. By signing the Agreement and acting thereon, *e.g.*, delivering its financial data and internal business documents, informing its customers, suppliers, and employees of what was in prospect, and the like, Noheel had become vulnerable—and appellant knew it. The very timing of events—the rush to reach an agreement, the ensuing silence, the abrupt pullout (without asking Noheel to explain or shed light upon supposed discrepancies), and the immediacy of the offer to renegotiate downward—seems compelling evidence of a scheme. And there was a "smoking gun" of sorts; the district court had before it internal memoranda authored by Compo executives, dated October 30 and November 12, 1981, respectively. The latter, which preceded repudiation by a matter of days, listed means of extracting "major concessions" on purchase price. Though Compo attempted effusively to explain away these and other events, the circumstances, at the least, permitted conflicting inferences. The district court was not bound to swallow appellant's gauzy explanations hook, line, and sinker.

We need not dwell on evidentiary detail. It suffices to say that, persiflage aside, the record palpably supports the bad faith finding. The district court was well within its proper domain in concluding, on these facts, that Compo set out to devise and implement a devious strategy designed to deprive Noheel of the full benefit of its bargain. The repudiation was but a tool engineered to serve this illicit purpose. There is no sound basis for appellant's claim of error.

## III. DAMAGES

Having ascertained that the district court was on solid footing in ruling that Compo wrongfully recanted the Agreement, *see supra* Parts I & II, we proceed to the question of damages (assessed by the district court in Noheel's favor in the sum of $416,400). Appellant contests the figure. We find the challenge to be unavailing.

Under Massachusetts law, Compo's breach excused Noheel from performing under the Agreement, *Fortune*, 364 N.E.2d at 1258–59; *Cellucci*, 331 N.E.2d at 814, and entitled appellee to damages. *See, e.g., Atteaux*, 245 Mass. at 498, 140 N.E. 271; *Jewett v. Brooks*, 134 Mass. 505, 506 (1883) ("The damages, like the contract, were entire, and all accrued on the day when the contract was repudiated.") (Holmes, J.); *see generally* 4 Corbin, *supra*, § 977; *Restatement, supra*, § 243(2). In Massachusetts, "the basic principle of contract damages is that the aggrieved party should be put in as good a position as if the other party had fully performed." *Laurin v. DeCarolis Constr. Co.*, 372 Mass. 688, 363 N.E.2d 675, 678 (1977). The Supreme Judicial Court laid down the rule long ago:

[T]he measure of damages [for buyer's refusal to perform is] the difference between the contract price and the market price of the [property] at the respective times and places at which it was to have been delivered.

*F.W. Stock & Sons v. Snell*, 213 Mass. 449, 453, 100 N.E. 830 (1913). *See also McTernan v. LeTendre*, 4 Mass.App.Ct. 502, 351 N.E.2d 566, 568 (1976) (similar); *Jewett*, 134 Mass. at 506 (damages to be "measured by the value of the contract of which the plaintiff was deprived").

■ The transaction between the parties was structured as an asset sale. Speaking in generalities, Compo was to purchase three groups of things: (1) inventory, (2) accounts receivable, and (3) machinery and equipment.[7] The purchase price for the first two classifications was variable, ultimately dependent on what inventory and receivables were on hand on the closing date. The district court ruled, appropriately we think, that no contract damages could be attributed to these items. *Noheel I* at 14. Since the amounts to be paid by Compo for inventory and receivables were to equal their actual value on the closing date, and since Noheel was left in possession of them when Compo pulled the plug, appellee's position was not worsened.

■ Machinery and equipment, however, was a different story. Compo had agreed to pay a set dollar figure—$616,000 —for these assets. The district court determined this to be a premium price; it found the value of the machinery and equipment, in toto, to be no more than $200,000. The presence of the premium can scarcely be disputed. The items included within this rubric had an aggregate book value of some $192,000; Barry Sansoucie placed the size of the boot at $416,-000; and even Kincman admitted that Compo was paying a "handsome premium" to acquire the assets. The clincher is that when Kincman and Cobuzzi requested in October that Compo's board of directors approve the acquisition, they estimated "the down side risk [as equalling] the difference between the liquidation of the assets and the invested capital which amounts to $300,000." Request for Capital Authorization, Plaintiff's Exhibit 2, *reprinted in* Record Appendix (R.A.) 1383–1411, at 1383–84. *See also id.* at 1390 (on asset purchase model, "premium over book value" estimated to be $424,000). Confronted with these evidentiary tidbits, the court proceeded to award $412,000 in damages to reflect the bonus component of the agreed price, along with a lagniappe of $4400 to cover loss of consultation fees under section 6.7 of the Agreement.[8] (Compo, we note, has not complained about inclusion of consulting fees as part of the damage computation).

Appellant decries the use of this measure of damages, contending that Noheel failed to prove the market value of the "subject" of the Agreement and therefore was not entitled to anything more than nominal damages. This argument, though ingenious, misses the mark. It proceeds from a flawed premise: appellant's sanguine characterization of the Agreement as one for the sale of a "going concern." Whether or not this characterization was apt, it was not exclusively apt. The Agreement could reasonably be seen in other perspectives. This was not a sale of corporate stock. Nor was it a sale of all the assets of the business. *See supra* note 7. Nor were the

---

7. Under the Agreement, Compo was to purchase most of Noheel's business assets. The seller was to retain various items described in section 1(a) of the Agreement, such as cash on hand, certain motor vehicles, all life insurance policies, and some loans receivable. Aside from the excluded assets—and, for this purpose, not including inventory and accounts receivable, which were to be acquired dollar-for-dollar—all of the other business assets were to be conveyed to Compo as a residuary aggregate (which we call "machinery and equipment"). Appellee argues that this residuary aggregate is limited to "assets that were reflected in [Noheel's] balance sheet on May 31, 1981...." Appellee's Brief at 41–42 n. 14. We do not read the Agreement so restrictively.

8. If the court's logic is followed precisely, it appears as if the award should have been $420,-400, computed as follows:

$$\begin{array}{ll} \$616,000 & \text{(agreed price)} \\ -\$200,000 & \text{(market value)} \\ \hline \$416,000 & \\ +\quad 4,400 & \text{(consulting fees)} \\ \hline \$420,400 & \end{array}$$

Be that as it may, Noheel has not prosecuted any cross-appeal. Thus, we happily disregard this minor discrepancy.

liabilities—part of any "going concern"—to be transferred. On any objective analysis, the shape and purport of the deal were delimited in such a way that it could be looked at—equally well or better—as a straight asset sale. The Agreement was designed, on its face, to set the stage for the purchase of Noheel's inventory, accounts receivable, machinery and equipment—no more, no less.

Furthermore, the record makes manifest many cogent reasons why Compo was willing to pay appreciably more than the property was worth. According to the Request for Capital Authorization, the transaction furnished Compo with a unique opportunity for (a) "[e]asy entry into a lower wage manufacturing area," (b) "increas[ing] [its] market share," (c) "improv[ing] profitability and return on capital" from its Styletek subsidiary, presumably by achieving economics of scale and taking advantage of wage rate differentials, (d) meeting Styletek's special "need for increased capacity," and (e) fulfilling what Compo had "previously identified as an important need" by expanding into the heel covering market. *See id.* at 1383–84. Appellant had no manufacturing capability for "fancy finishing" (an operation wherein heels are wrapped with material similar to that used for the uppers), *id.* at 1386, and appellee had both the mechanical capability to perform this feat, and a "well trained workforce in ... fancy finishing." *Id.* at 1387. This acquisition, Compo thought, would allow it to perform in-house work previously "subcontracted for ... [or] lost to the competition." *Id.* at 1386. While such considerations were presumably of great value to the acquirer, they were of no commensurate benefit to Noheel when the acquirer—for no good reason—changed its corporate mind.

Judges, unlike ostriches, are not required to bury their heads periodically in the sand. We are not so struthious as to believe that Compo did not intentionally seek to structure the Agreement in precisely this way, for its own financial benefit, *e.g.*, to ameliorate its tax posture, to maximize the advantages of the "fit" between Noheel's business and Styletek's, and to protect itself from inherited liabilities. *See, e.g., id.* at 1388 ("This method of acquisition is to our advantage, because, when buying a small privately held company there is generally reason for concern over the extent of liabilities—recorded or otherwise."); *id.* at 1390 (discussing plan to recover machinery and equipment "premium" in form of tax write-off by manipulation of depreciation). Appellant cannot at this late date unilaterally rewrite the bargain. This was not inevitably a sale of a "going concern," but could well be seen, as the district court apparently viewed it, as a sale only of specified assets.[9]

Looking at the structural design of the Agreement in this fashion, we cannot fault the district court's rationale or its methodology. Noheel was entitled to the benefit of its bargain. *Laurin*, 363 N.E.2d at 678; *Stock & Sons*, 213 Mass. at 453, 100 N.E. 830. Its profit on the sale stood to flow only from the built-in premium. The district judge's use of this differential in calculating the award mirrored the plaintiff's legitimate expectations. It was, in short, but a welcome example of the law faithfully tracking the economic reality of events.

There is often more than one satisfactory method for ascertaining the quantum of damages. *See, e.g., Sullivan v. O'Connor*, 363 Mass. 579, 296 N.E.2d 183, 186–89 & nn. 3–6 (1973) (discussing various alternate measures of damages for breach of contract, including expectancy, restitutionary,

---

**9.** For this very reason, the district court's gratuitous statement that Noheel's "liabilities were offset by the value of its receivables and inventory," *Noheel I* at 14, much criticized by Compo, is of no consequence. As a simple matter of accounting, the ruling that Noheel was not entitled to damages for its inventory and accounts receivable (since it was selling those assets to Compo on a dollar-for-dollar basis) has not been appealed by Noheel and did not aggrieve Com-

po; accordingly, it is the law of the case. Equally as important, the transaction did not envision Compo assuming any liabilities of Noheel. Absent evidence that appellee's obligations could not have been satisfied at the closing and would somehow have scotched the deal—and we have found none—the court's remarks as to the relative extent of the seller's liabilities were dicta, and harmless.

and reliance bases); *John Hetherington & Sons, Ltd. v. William Firth Co.,* 210 Mass. 8, 21, 95 N.E. 961, 964 (1911) (in contract action, injured party's loss may be computed by any "rational methods upon a firm basis of facts"); *In re San Juan Hotel Corp.,* 847 F.2d 931, 937–38 (1st Cir.1988) (where fact but not precise extent of harm established, various forms of estimates may be equally acceptable in arriving at amount); *see also United States v. Miller,* 317 U.S. 369, 373–74, 63 S.Ct. 276, 279–80, 87 L.Ed. 336 (1943) (in takings case, "[i]t is conceivable that an owner's indemnity should be measured in various ways"); *United States v. 22.80 Acres of Land,* 839 F.2d 1362, 1363–65 (9th Cir.1988) (within broad limits, district court may determine which valuation methodology will best achieve just compensation for loss). Although there may have been other allowable approaches to the question of damages in this case, restoring the lost premium on machinery and equipment to Noheel to compensate it for defendant's breach was a sound way "[t]o replicate plaintiff's position." *Moores v. Greenberg,* 834 F.2d 1105, 1110 (1st Cir.1987).[10] As we have said before, "once the fact of damage is established, the trial judge [in a bench trial] has much latitude in fixing the amount...." *Rivera Morales v. Benitez de Rexach,* 541 F.2d 882, 886 (1st Cir.1976). In this instance, the district court did not stray out of bounds.

## IV. FEES

After trial, appellee moved for counsel fees pursuant to the following clause:

Each party hereto will indemnify and hold harmless the other party against all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees) resulting from any breach by the indemnifying party of any of its warranties, representations or agreements contained herein.

Agreement § 12. The district court granted the application and ordered Compo to pay $72,240 in attorneys' fees. *Northern Heel Corp. v. Compo Industries, Inc.,* No. C82–71 (D.N.H. April 17, 1986) (*Noheel II* ). Compo protests both the fact and the amount of the award. But appellant's effort to deny plaintiff *any* fee award stems from its assumption that the case was wrongly decided and permeated by reversible error. By now, that assumption has been thoroughly discredited. *See supra* Parts I–III. Section 12, therefore, was in play.

■ As to the plea that the amount was improperly computed, and oversized, we look first to the fee petition. Noheel asked for $72,240. It compiled the figure by determining a suggested base fee or "lodestar," *see Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *United States v. Metropolitan Dist. Comm'n,* 847 F.2d 12, 15 (1st Cir. 1988), which it calculated to be $28,518. It then urged that the lodestar be boosted by a "multiplier" of 2.5, and added $945 for

10. Compo argues that it was Noheel's burden to offer evidence as to the market value of its business as a going concern. We disagree. As pointed out in the text, the business was not being sold as a going concern. Liabilities were not assumed and certain assets were reserved. If there was some sort of continuing "going concern" value attributable to the remainder, the benefit of which might remain with Noheel notwithstanding the breach, the information as to what that value might be was well within Compo's ken. It, after all, had approached no less than four other acquisition candidates since mid 1979, *see* R.A. 933–37 & Exhibit 7, and presumably had considerable expertise in evaluating opportunities. If appellant felt that a "going business value" approach to damages was more fairly reflective of "the difference between the contract price and the market price," *Stock & Sons,* 213 Mass. at 453, 100 N.E. 830, it could have offered evidence of such an alternative valuation method. It chose not to do so. Having kept the cow at home, it ill behooves appellant to weep so copiously over the shortage of milk. *See Marquis Theatre Corp. v. Condado Mini Cinema,* 846 F.2d 86, 92 (1st Cir.1988) (where defendant could have, but did not, produce evidence to refute or reduce claimed lost profits, no error for court to rely on evidence at hand); *cf. Knightsbridge Marketing Services, Inc. v. Promociones y Proyectos,* 728 F.2d 572, 575 (1st Cir.1984) (defendant cannot be heard "to complain about speculative evidence when it ... refused to furnish the information that could have eliminated or greatly reduced any speculation").

paralegal costs. The district court accepted these computations lock, stock, and barrel, and awarded appellee the full amount of its requested fees.

In *Segal v. Gilbert Color Systems*, 746 F.2d 78 (1st Cir.1984), we made clear that the lodestar method was the approach of choice when a federal court was called upon to award counsel fees "in cases involving the fee-shifting provisions of ... federal statutes which do not expressly dictate an alternative method." *Id.* at 85–86. Yet in this case, the award of counsel fees was not dependent upon any *federal* statute. This was a diversity suit where Massachusetts law controlled. *See supra* at 460. In diversity cases, "state rather than federal law governs the issue of the awarding of attorney's fees." *Shelak*, 636 F.2d at 1072; *see also Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, n. 31, 44 L.Ed.2d 141 (1975); *Blanchette v. Cataldo*, 734 F.2d 869, 878 (1st Cir.1984) ("where an award of fees or costs rests on state law, state law also controls the method of calculating the size of the award"); *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 232 (1st Cir.1980) (similar); *United States v. Midwest Constr. Co.*, 619 F.2d 349, 352–53 (5th Cir.1980) (characterizing issue of awarding attorneys' fees as substantive). Inasmuch as the quest for attorneys' fees in this case comprised a substantive part of the state-law remedy for a state-law cause of action, the proper rule of decision governing the award should have been derived from Massachusetts, rather than federal, practice.[11]

In Massachusetts, counsel fees can be assessed pursuant to "specific affirmative authority," such as a contract or statute. *See Griefen v. Treasurer and Receiver General*, 390 Mass. 674, 459 N.E.2d 451, 452 (1983); *Lincoln St. Realty Co. v. Green*, 374 Mass. 630, 373 N.E.2d 1172, 1173 (1978). Here, section 12 of the Agreement furnished the necessary underpinning. Once the district court found that Compo had wrongfully repudiated and that Noheel had been forced to retain counsel to protect its interests, all that remained was to invoke the parties' proviso and establish the amount of the award.

Under Massachusetts law, if neither the prevailing party's contractual right to counsel fees nor the terms of its engagement agreement with its lawyers "fix[es] the amount of fees either in dollar amount or by formula," the amount due should be assessed on the basis of "fair and reasonable compensation for the services rendered." *First National Bank of Boston v. Brink*, 372 Mass. 257, 361 N.E.2d 406, 410 (1977) (citation omitted). But in this case, Noheel's retainer of counsel was not inscrutable; client and lawyer had agreed to a contingent fee arrangement. The operative language of the written engagement agreement, executed in January 1985, is set out in the margin.[12] Where the contract for employment of counsel provides a clear and workable formula for determining the amount of fees, the terms of the agreement will usually control. *Id.* 361 N.E.2d at 410–11. If lawful—and, generally speaking, contingent fees have not been thought unlawful or contrary to public policy in the commonwealth for well over two decades, *see Snow v. Mikenas*, 373 Mass. 809, 370 N.E.2d 1001, 1002–03 & n. 4 (1977),—the contingent fee should be enforced unless it is unreasonable under the circumstances. *Snow*, 370 N.E.2d at 1003; *cf.* S.J.C. Rule 3:05, as amended, *reprinted in* 382 Mass.

---

**11.** This conclusion assumes, of course, that state law is definite and ascertainable (as is here the case, *see infra*). To the extent that state law is "devoid of specific self-contained criteria," *Segal*, 746 F.2d at 86 n. 8, or seems "silent or incomplete on the [manner of] calculation" of fees, *McGinty*, 633 F.2d at 232, federal standards may well become relevant.

**12.** As the district court found, the contingent fee agreement read in relevant part as follows:

> Reasonable compensation on the foregoing contingency [recovery against Compo] is to be paid by the client to the attorney, but such compensation (including that of any associated counsel) is not to exceed the following maximum percentages of the net amount collected: Twenty-five percent (25%) of whatever may be recovered from said claim, whether by suit, settlement or any other manner.
>
> *Noheel II* at 2.

762 (1981) (reasonableness of contingent fee agreement subject to judicial review).

In this instance, literal compliance with the terms of the engagement agreement would have yielded a fee of $104,100 (25% of $416,400). Under state law as we read it, we see no reason why this agreement should not control. *See Snow*, 370 N.E.2d at 1003 (contingent fee agreements, if regular on their face, ordinarily "prima facie valid and binding"). Yet, for reasons not apparent from the record furnished to us—a record for which appellant must bear responsibility, *see Falu v. Secretary of HHS*, 703 F.2d 24, 27 (1st Cir.1983); *United States v. One Motor Yacht Named "Mercury,"* 527 F.2d 1112, 1113 (1st Cir. 1975)—Noheel eschewed presentation of its request on a straightforward contingent fee basis, but tendered a more elaborate lodestar-cum-multiplier claim which yielded fewer dollars. We assume that this resulted from the judge's prudential exercise of his acknowledged authority "properly [to] require the attorneys to establish the reasonableness of the contingent fee agreements as a condition to the receipt of their fees." *Snow*, 370 N.E.2d at 1003. Once the judge triggered this inquiry, it was appellee—*qua* movant—which had the devoir of persuasion. *Id.* Without serious question, the burden was satisfactorily carried.

Massachusetts law provides that "in setting a fee there are many relevant considerations beside the amount of time ... necessary to resolve the case." *McInerney v. Massasoit Greyhound Ass'n*, 359 Mass. 339, 269 N.E.2d 211, 219 (1971). Given the complexity of the litigation, the amount of work reflected by the record, the number of artificial obstacles placed by Compo in appellee's path, and the quality of the services rendered, a fee of $104,100 seems not unreasonable for the prosecution of the enforcement action and the successful defense of the counterclaims.[13] This appears particularly appropriate because Massachusetts law encourages courts, in setting fees —even where fee-shifting is involved—to

attach weight to the presence of "difficult issues," *Sack v. Sack*, 328 Mass. 600, 105 N.E.2d 371, 375 (1952), and this litigation presented many. It necessarily follows that, as the district court ruled, the fees actually sought—representing as they did a substantial discount on the actual client-lawyer arrangement and amounting to less than 20% of the damages recovered—were "[f]rom an ultra conservative point of view" reasonable. *Noheel II* at 4.

Although perhaps supererogatory in light of the foregoing discussion, we explicitly reject Compo's argument that the fee award transgressed "strictly conservative principles." *Brink*, 361 N.E.2d at 411; *Lewis v. National Shawmut Bank*, 303 Mass. 187, 21 N.E.2d 254, 256–57 (1939). In the first place, fee-shifting in this case is not an obligation superimposed upon appellant by statute, judicial decree, or operation of law. Rather, it stems from a contract voluntarily entered into by the party to be charged. In Massachusetts, when a fee award is sought pursuant to a provision of a pact between the lawyer's actual client and the client's litigation adversary, "the agreement between the parties resembles a contract of indemnity and contemplates that the prevailing party will be reimbursed for his attorney's fees." *Lincoln St. Realty Co.*, 373 N.E.2d at 1174; *cf. Paone v. Gerrig*, 362 Mass. 757, 291 N.E.2d 426, 430–31 (1973). Thus, we doubt that the *Lewis* rule is apposite. In the second place, assuming *arguendo* that the proper benchmark was one of computation in accordance with "strictly conservative principles," the district court, in effect, found that benchmark to have been attained. *See Noheel II* at 4.

This finding is an eminently supportable one. Although the goal may be higher if "strictly conservative principles" apply, the raw materials remain the same. The factors to be considered in either event include (in addition to the amount of time reasonably spent to resolve the case),

> the ability and reputation of the attorney, the demand for his services by oth-

---

13. Because Noheel elected to limit its counsel fee claim to the lodestar-cum-multiplier product, and has not filed a cross appeal complain-

ing about the amount awarded, we need not reach the question of whether or not more munificent fees could, or should, have been given.

ers, the amount and importance of the matter involved, ... the prices usually charged for similar services by other attorneys in the same neighborhood, ... the value of the property affected by the controversy, and the results secured. *McInerney,* 269 N.E.2d at 219 (quoting *Cummings v. National Shawmut Bank,* 284 Mass. 563, 569, 188 N.E. 489 (1934)); *see Paone,* 291 N.E.2d at 431; *cf. McMahon v. Krapf,* 323 Mass. 118, 80 N.E.2d 314, 318 (1948) (listing factors appropriate for consideration is fixing fiduciary's fees). While each may be significant, no single factor is alone decisive. *Paone,* 291 N.E.2d at 431.

In the case *sub judice,* the skill and stature of appellee's counsel are unquestioned; the size and importance of the matter is self-evident; the issues were complex and difficult; at its zenith, the contingency percentage which Noheel had agreed to pay its attorneys was reasonable (and in any event, the actual charge was considerably less than application of the maximum percentage allowed); and, as the district court expressly found, "[t]he results obtained after five years of litigation, a judgment of $416,400.00, were good from the plaintiffs' perspective." *Noheel II* at 4. Moreover, "[t]he case was well prepared and ably tried...." *Id.* Under the circumstances, even viewing the $72,400 with the parsimony thought becoming a Brahmin banker, the lawyers' remuneration was modest for the time they spent and the success they achieved. In fine, the agreed fee of $104,100 was a reasonable one by conventional standards, *see supra* at 475–476, and the reduced fee was reasonable under "strictly conservative principles." [14]

## V. CONCLUSION

The shoe, fitting, must be worn. Compo, logic suggests, was more likely victimizer than victim—and the district court so found. Sitting as the arbiter of the facts, it ascertained that appellant withdrew from the Agreement without cognizable cause and in bad faith. After taking elaborate pains to negotiate price and terms for the purchase, and successfully reducing the arrangement to a writing signed by all parties, Compo pulled back. It says that it did so because it learned, belatedly, that the seller had misdescribed matters and failed to fulfill conditions precedent. Yet the district court found, supportably we think, that Noheel was guilty of no material misrepresentation or other blameworthy behavior, and that Compo's accusations were plucked from thin air. The real motive underlying appellant's "machinations," the district judge wrote, was its desire, without legal justification, to club Noheel into taking "a lower figure" than the contract price. *Noheel I* at 12. Thus, Compo was guilty of a willful failure to perform. And its breach was total.

Having essayed a lengthy excursion through the nisi prius roll, we are disinclined to disturb this series of fact-based determinations. Because they seem "plausible in light of the record," *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511, we cannot say they were "clearly wrong." Nothing which the appellee did, or neglected to do, opened the seacocks for appellant to scuttle the transaction.

The rest is straightforward. Once Compo devised and set in motion its peccant strategy, it loosed an unfounded repudiation looking selfishly for a place to happen. Noheel refused to buckle. It sued instead—and won. The liability finding in its favor comports with the weight of the evidence and the fair inferences therefrom, and the sums awarded as damages and as attorneys' fees fall within permissible bounds.

We need go no further. The appeal is, in our view, bootless.

*Affirmed.*

14. Given the view we take of the question of attorneys' fees, we do not examine into the propriety of using a "multiplier" to calculate counsel fees under Massachusetts law. We do note, however, that we have upheld a fee award under M.G.L.A. c. 93A, § 11, produced by the use of a multiplier of 1.25, against a challenge that the award was inordinately low. *See Computer Systems Engineering, Inc. v. Qantel Corp.,* 740 F.2d 59, 70–71 (1st Cir.1984).